COMMISSIONER OF INTERNAL REV-
ENUE, Petitioner,

v.

José FERRER, Respondent.

No. 248, Docket 27232.

United States Court of Appeals
Second Circuit.

Argued April 24, 1962.

Decided June 5, 1962.

David O. Walter, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., on brief), for petitioner.

Samuel L. Siegel, New York City (Edwin M. Reiskind, New York City, of counsel), for respondent.

Before FRIENDLY, SMITH and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

This controversy concerns the tax status of certain payments received by José Ferrer with respect to the motion picture "Moulin Rouge" portraying the career of Henri de Toulouse-Lautrec. The difficulties Mr. Ferrer must have had in fitting himself into the shape of the artist can hardly have been greater than ours in determining whether the transaction here at issue fits the rubric "gain from the sale or exchange of a capital asset held for more than 6 months," Internal Revenue Code of 1939, § 117(a) (1) and (4), 26 U.S.C.A. § 117(a) (1, 4), as the Tax Court held, 35 T.C. 617 (1961), or constitutes ordinary income, as the Commissioner contends. We have concluded that neither party is entirely right, that some aspects of the transaction fall on one side of the line and some on the other, and that the Tax Court must separate the two.

In 1950 Pierre LaMure published a novel, "Moulin Rouge," based on the life of Toulouse-Lautrec. He then wrote a play, "Monsieur Toulouse," based on the novel. On November 1, 1951, LaMure as "Author" and Ferrer, a famous actor but not a professional producer, as "Manager" entered into a contract, called a Dramatic Production Contract, for the stage production of the play by Ferrer.

The contract was largely on a printed form recommended by the Dramatists Guild of the Authors League of America, Inc. However great the business merits of the document, which are extolled in Burton, Business Practices in the Copyright Field, in C. C. H., 7 Copyright Problems Analyzed (1952) 87, 109, for a court, faced with the task of defining the nature of the rights created, it exemplifies what a contract ought not to be. Its first six pages include eleven articles, some introduced by explanatory material whose contractual status is, to say the least, uncertain. Here the last of these pages was preceded by three single-spaced typewritten pages of "Additional Clauses," one with a still further insert. Finally come 15 pages of closely printed "Supple-

mental Provisions," introduced by explanatory material of the sort noted. We shall thread our way through this maze as best we can.

By the contract the Author "leased" to the Manager "the sole and exclusive right" to produce and present "Monsieur Toulouse" on the speaking stage in the United States and Canada, and gave certain rights for its production elsewhere. Production had to occur on or before June 1, 1952, unless the Manager paid an additional advance of $1500 not later than that date, in which event the deadline was extended to December 1, 1952. Five hundred dollars were paid as an initial advance against Author's royalties; the Manager was required to make further advances of like amount on December 1, 1951, and January 1, 1952. Royalties were to be paid the Author on all box-office receipts, on a sliding scale percentage basis.

Article Seventh said that "In the event that under the terms hereof the Manager shall be entitled to share in the proceeds of the Motion Picture and Additional Rights hereafter referred to, it is agreed that the Manager shall receive" 40% for the first ten years and diminishing percentages thereafter. Among the additional rights so described were "Radio and Television."

For the beginning of an answer whether the Manager would be so entitled, we turn to Article IV, § 2, of the Supplemental Provisions. This tells us that "In the event the Manager has produced and presented the play for the 'Requisite Performances and Terms,' the Negotiator shall pay the Manager" the above percentages "of the proceeds, from the disposal of the motion picture rights." Article VI, § 3, contains a similar provision as to payment by the Author of the proceeds of the "additional rights" including radio and television. The "Requisite Performances and Terms" are defined in Article XIII, § 9(b); we shall say more about the "Negotiator" hereafter.

Further provisions put flesh on these bones. Article IV, § 1(a), says that "The title" to the motion picture rights "vests in the Author, as provided in Article VIII hereof." Article VIII says, even more broadly, "The Author shall retain for his sole benefit, complete title, both legal and equitable, in and to all rights whatsoever (including, but not by way of limitation, the Motion Picture Rights * * * Radio and Television Rights * * *)," other than the right to produce the play. The Motion Picture Negotiator, a person appointed by the Council of the Dramatists Guild, Article V, §§ 1 and 6, has power to dispose of the motion picture rights. However, he may not do this without the written consent of both Author and Manager "prior to the time the play has been playing for any of the respective periods of time referred to in Article XIII, Section 9(b) hereof," Article IV, § 1(b). This prohibition serves a double purpose—it protects the Manager from dilution of the value of the right to produce the play through too early exhibition of a picture, and it promotes realization of the enhancement in the value of the motion picture rights normally resulting from successful dramatic production. Doubtless for similar reasons, the Author could not, without the consent of the Manager, permit the release of radio and television rights until first-class production of the play had ceased. Article V, § 1(b), decrees that the Manager shall "have no right, title or interest, legal or equitable, in the motion picture rights, other than the right to receive the Manager's share of the proceeds * * *" Article V, § 1(c), lays down that if the Manager deems "himself aggrieved by any disposition of motion picture rights, he shall have no recourse, in law or in equity," against a purchaser, a lessee, or the Negotiator; "the Manager's sole recourse * * * shall be against the Author and only by arbitration as provided hereunder." Article V, § 1(d), says it again: "No claim of the Manager, howsoever arising, shall constitute a cloud on the title to the motion picture rights; and a purchaser or lessee thereof shall have the right to deal freely and exclusively with the Author and Negotiator * * *"

Having been somewhat upstaged by these provisions, the Manager then returns toward the center under other clauses. The Negotiator must confer with him, as well as with the Author, on every step in the disposition of the motion picture rights. "It is desirable that the price shall be mutually satisfactory to both Author and Manager," Article V, § 2(a). If the Manager does not like an offer the Negotiator is planning to accept, he has an opportunity to turn up a better one, ibid. All moneys received for the motion picture rights are to be deposited in a special account, Article V, § 3. An insert to one of the "Additional Clauses" provides that if the Manager desires, the Author, not later than three weeks after the New York opening of the play, will "discuss a proposed deal for the Manager to acquire" the motion picture rights. Finally, another "Additional Clause" prescribes that "All dramatic, motion picture, radio and television rights in the novel MOULIN ROUGE shall merge in and with the play during the existence of this contract," and if the Manager produces and presents the play for a sufficient period, "throughout the copyright period of the play."

Shortly after signature of the Dramatic Production Contract, John Huston called Ferrer to ask whether he would be interested in playing Toulouse-Lautrec in a picture based upon "Moulin Rouge." On getting an affirmative indication, Huston said he would go ahead and acquire the motion picture rights. Ferrer replied, in somewhat of an exaggeration, "When you get ready to acquire them talk to me because I own them."

Both Huston and Ferrer then had discussions with LaMure. Ferrer expressed a willingness "to abandon the theatrical production in favor of the film production, provided that, if the film production were successful, I would be recompensed for my abandoning the stage production." On the strength of this, LaMure signed a preliminary agreement with Huston's corporation. In further negotiations, Huston's attorney insisted on "either an annulment or conveyance" of the Dramatic Production Contract. LaMure's lawyer prepared a letter of agreement, dated February 7, 1952, whereby Ferrer would cancel and terminate the Contract. Ferrer signed the letter but instructed his attorney not to deliver it until the closing of a contract between himself and the company that was to produce the picture; the letter was not delivered until May 14, 1952.

Meanwhile, on May 7, 1952, Ferrer entered into a contract with Huston's company, Moulin Productions, Inc. ("Moulin"), hereafter the Motion Picture Contract. This was followed by an agreement and assignment dated May 12, 1952, whereby LaMure sold Huston all motion picture rights to his novel, including the right to exploit the picture by radio and television. Under this agreement LaMure was to receive a fixed sum of $25,000, plus 5% and 4% of the Western and Eastern Hemisphere motion picture profits, respectively, and 50% of the net profits from exploitation by live television.

The Motion Picture Contract said that Romulus Films Limited, of London, proposed to produce the picture "Moulin Rouge," that Moulin would be vested with the Western Hemisphere distribution rights, and that Moulin on behalf of Romulus was interested in engaging Ferrer's service to play the role of Toulouse-Lautrec. Under clause 4(a), Ferrer was to receive $50,000 to cover 12 weeks of acting, payments to be made weekly as Ferrer rendered his services. Ferrer's performance was to begin between June 1 and July 1, 1952. By clause 4(b), Ferrer was to receive $10,416.66 per week for each additional week, but this, together with an additional $50,000 of salary provided by clause 4(c), was "deferred and postponed" and was payable only out of net receipts. Finally, clauses 4(d) and (e) provided "percentage compensation" equal to stipulated percentages of the net profits from distribution of the picture in the Western and Eastern Hemispheres respectively—17% of the Western Hemisphere net profits until Ferrer had received $25,000 and there-

after 12¾% (such payments to "be made out of sixty-five (65%) percent of the net profits," whatever that may mean), and 3¾% of the Eastern Hemisphere net profits. If Ferrer's services were interrupted by disability or if production of the picture had to be suspended for causes beyond Moulin's control, but the picture was thereafter completed and Ferrer's "acts, poses and appearances therein" were recognizable to the public, he was to receive a proportion of the compensation provided in clauses 4(c), (d) and (e) corresponding to the ratio of his period of acting to 12 weeks. The same was true if Ferrer failed to "conduct himself with due regard to public conventions and morals" etc. and Moulin cancelled on that account. The absence of any similar provision with respect to termination for Ferrer's wilful refusal or neglect to perform services indicates that all his rights, except that for compensation already due under clause 4(a), would be forfeited in that event. Over objections by the Commissioner, Ferrer offered testimony by Huston's attorney, who was also president of Moulin, that in the negotiation "it was said that the ultimate percentage payment to be made to Ferrer would be his compensation for giving up his interest in the dramatization guild," and a letter from the same attorney, dated March 3, 1953, confirming that in the negotiations with Ferrer's attorney "for the sale of the dramatic rights held by you to the property entitled 'MONSIEUR TOULOUSE' and the novel 'MOULIN ROUGE,' is was understood that the consideration for such sale price was the payments due, or to become due, to you under Clause 4(d) and Clause 4 (e)," and also that LeMure "refused to sell the motion picture rights for the production of the motion picture known as 'MOULIN ROUGE' unless you sold the aforesaid dramatic rights." Ferrer's agent testified, again over objection, that the largest salary Ferrer had previously received for a moving picture appearance was $75,000.

Moulin's books showed $109,027.74 as a salary payment to Ferrer in August, 1953, and $178,751.46 at various later dates in 1953 as the payment of "Participating Interests" under clause 4(d).[1] Ferrer's 1953 return reported the former as ordinary income, and the latter, less expenses of $26,812.72,[2] as a long-term capital gain. The Commissioner determined a deficiency on the basis that the difference, $151,938.74, constituted ordinary income; from the Tax Court's annulment of that determination he has taken this appeal.

Section 117(a) of the 1939 Code, now § 1221 of the 1954 Code, 26 U.S.C.A. § 1221, tells us, not very illuminatingly, that " 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include" four (now five) types of property therein defined. However, it has long been settled that a taxpayer does not bring himself within the capital gains provision merely by fulfilling the simple syllogism that a contract normally constitutes "property," that he held a contract, and that his contract does not fall within a specified exclusion, C. I. R. v. Gillette Motor Transport, Inc., 364 U.S. 130, 134–135, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960); Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv. L.Rev. 985, 988 (1956). This is easy enough; what is difficult, perhaps impossible, is to frame a positive definition of universal validity. Attempts to do this in terms of the degree of clothing adorning the contract cannot explain all the cases, however helpful they may be in deciding some, perhaps even this one; it would be hard to think of a contract more "naked" than a debenture, yet no one doubts that is a "capital asset" if held

---

1. The record is silent on payments for Eastern Hemisphere profits under clause 4(e), or on whether there will be further payments for Western Hemisphere profits under clause 4(d); we suppose both these will come in later years.

2. The record does not disclose the nature of these expenses, but the Commissioner has not questioned them.

by an investor. Efforts to frame a universal negative, e.g., that a transaction can never qualify if the taxpayer has merely collapsed anticipation of future income, are equally fruitless; a lessor's sale of his interest in a 999 year net lease and an investor's sale of a perpetual bond sufficiently illustrate why, as does Ayrton Metal Co. v. C. I. R.., 299 F.2d 741 (2 Cir. 1962).

Perhaps we can get more help from analyzing the fact situations in cases in adjacent areas, including those decided since Judge Smith's careful review in C. I. R. v. Pittston Company, 252 F.2d 344 (2 Cir.), cert. denied, 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364 (1958), than from the language of the opinions. Putting aside Jones v. Corbyn, 186 F.2d 450 (10 Cir. 1950), which we have disapproved, C. I. R. v. Starr Bros., Inc., 204 F.2d 673, 674 (2 Cir. 1953) and whose status in its own circuit has now become rather doubtful, Wiseman v. Halliburton Oil Well Cementing Co., 301 F.2d 654, (10 Cir. 1962), a case to which we refer below, and C. I. R. v. Goff, 212 F.2d 875 (3 Cir.), cert. denied, 348 U.S. 829, 75 S.Ct. 52, 99 L.Ed. 654 (1954), which is only dubiously reconcilable with our Pittston decision, the principal relevant authorities on the two sides of the line in the Supreme Court and in the courts of appeals are as follows: There is no sale or exchange of a capital asset when a lessor receives payment for releasing a lessee from an obligation to pay future rent, Hort v. C. I. R., 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941). The same was true of the cancellation of an exclusive distributorship, C. I. R. v. Starr Bros., Inc., 204 F.2d 673 (2 Cir. 1953); Leh v. C. I. R., 260 F.2d 489 (9 Cir. 1958), although § 1241 of the 1954 Code, 26 U.S.C.A. § 1241 now rules otherwise if the distributor has a substantial capital investment therein. The transfer of exclusive agency rights to a third person likewise did not qualify, General Artists Corp. v. C. I. R., 205 F.2d 360 (2 Cir.), cert. denied, 346 U.S. 866, 74 S.Ct. 105, 98 L.Ed. 376 (1953); whether it now does if the capital investment require-

ment of § 1241 is met is another question. The sale of oil payment rights, C. I. R. v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958), the temporary taking of a taxpayer's right to use his own transportation assets, C. I. R. v. Gillette Motor Transport, Inc., supra, and the surrender of an exclusive contract to purchase coal, C. I. R. v. Pittston Co., supra, do not meet the statutory test. Neither does the receipt of a lump sum in liquidation of a percentage of the gross receipts of motion pictures otherwise payable to a producer solely in return for personal services not yet performed, Holt v. C. I. R., 303 F.2d 687 (9 Cir. 1962). On the other hand, a lessee's surrender of his lease to the lessor, C. I. R. v. Golonsky, 200 F.2d 72 (3 Cir. 1952), cert. denied, 345 U.S. 939, 73 S. Ct. 830, 97 L.Ed. 1366 (1953); C. I. R. v. McCue Bros. & Drummond, Inc., 210 F.2d 752 (2 Cir.), cert. denied, 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654 (1954), now in effect ratified by § 1241 of the 1954 Code, his relinquishment of a right to restrict the lessor's renting to another tenant in the same business, C. I. R. v. Ray, 210 F.2d 390 (5 Cir.), cert. denied, 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654 (1954), and his release of his entire interest to a sublessee, Metropolitan Bldg. Co. v. C. I. R., 282 F.2d 592 (9 Cir. 1960), but see Voloudakis v. C. I. R., 274 F.2d 209 (9 Cir. 1960), constitute the sale or exchange of a capital asset. So does the abandonment of an option to acquire a partnership interest, Dorman v. United States, 296 F.2d 27 (9 Cir. 1961).

■■ One common characteristic of the group held to come within the capital gain provision is that the taxpayer had either what might be called an "estate" in (Golonsky, McCue, Metropolitan), or an "encumbrance" on (Ray), or an option to acquire an interest in (Dorman), property which, if itself held, would be a capital asset. In all these cases the taxpayer had something more than an opportunity, afforded by contract, to obtain periodic receipts of income, by dealing with another (Starr, Leh, General

Artists, Pittston), or by rendering services (Holt), or by virtue of ownership of a larger "estate" (Hort, P. G. Lake). We are painfully aware of the deficiencies of any such attempt to define the wavering line even in this limited area, but it is the best we can do. We add, with greater confidence, that more recent cases, such as McCue & Drummond, Ray, Metropolitan, and Dorman, have moved away from the distinction, relied upon to some extent in Starr Brothers and General Artists,[3] between a sale to a third person that keeps the "estate" or "encumbrance" alive, and a release that results in its extinguishment.[4] Indeed, although reasoning from another section of a statute so full of anomalies is rather treacherous business, we take § 1241 of the 1954 Code as indicating Congressional disenchantment with this formalistic distinction. In the instant case we can see no sensible business basis for drawing a line between a release of Ferrer's rights to LaMure for a consideration paid by Moulin, and a sale of them, with LaMure's consent, to Moulin or to a stranger who would then release them. Moulin's attorney, as we have seen, did not care a fig whether there was "an annulment or conveyance" of the Dramatic Production Contract. Tax law is concerned with the substance, here the voluntary passing of "property" rights allegedly constituting "capital assets," not with whether they are passed to a stranger or to a person already having a larger "estate." So we turn to an analysis of what rights Ferrer conveyed.

Two issues can be eliminated before we do this. We need no longer concern ourselves, as at one time we might have been obliged to do, over the alleged indivisibility of a copyright; the Commissioner is now satisfied that sales and exchanges of less than the whole copyright may result in capital gain, Rev.Rul. 60–226,

1960–1 Cum.Bull. 26. See also Gitlin & Woodward, Tax Aspects of Patents, Copyrights and Trademarks (1960 rev.) 18–19; Sargoy, Formalities and Ownership, 9 Bull.Cr.Soc. 20, 43 (1961); Surrey & Warren, Federal Income Taxation, Cases and Materials (1960) 753. Neither do we have in this case any issue of excludability under § 117(a) (1) (A), now § 1221 (1); Ferrer was not in the "trade or business" of acquiring either dramatic production rights or motion picture rights.

When Huston displayed an interest in the motion picture rights in November, 1951, Ferrer was possessed of a bundle of rights, three of which are relevant here. First was his "lease" of the play. Second was his power, incident to that lease, to prevent any disposition of the motion picture rights until June 1, 1952, or, on making an additional $1500 advance, to December 1, 1952, and for a period thereafter if he produced the play, and to prevent disposition of the radio and television rights even longer. Third was his 40% share of the proceeds of the motion picture and other rights if he produced the play. All these, in our view, Ferrer "sold or exchanged," although the parties set no separate price upon them. To be sure, Moulin had no interest in producing the play. But Ferrer did, unless a satisfactory substitute was provided. Hence Moulin had to buy him out of that right, as well as to eliminate his power temporarily to prevent a sale of the motion picture, radio and television rights and to liquidate his option to obtain a share of their proceeds.

■■ (1) Surrender of the "lease" of the play sounds like the transactions held to qualify for capital gain treatment in Golonsky and McCue Bros. & Drummond, see § 1241 of the 1954 Code. Such cases as Wooster v. Crane & Co., 147 F.

---

3. These cases could well have been decided on the basis that the taxpayer held only a contract right giving him an opportunity to earn future income.

4. We say this despite certain language in Leh v. C. I. R., 260 F.2d 489 (9 Cir.

1958) and in Holt v. C. I. R., 303 F.2d 687 (9 Cir. 1962), both of which, like the cases referred to in footnote 3, validly rested on the absence of a "capital asset."

515 (8 Cir. 1906), Underhill v. Schenck, 238 N.Y. 7, 143 N.E. 773, 33 A.L.R. 303 (1924), and Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163 (1933) are *a fortiori* authority that courts would have enjoined LaMure, or anyone else, from interfering with this, unless the Dramatic Production Contract dictated otherwise. None of its many negations covered this basic grant. Ferrer thus had an "equitable interest" in the copyright of the play.

The Commissioner did not suggest in the Tax Court, and does not here, that this interest or, indeed, any with which we are concerned in this case, fell within § 117(a) (1) (C) of the 1939 Code, now § 1221(3), excluding from the term "capital asset" "a copyright; a literary, musical, or artistic composition; or similar property; held by—

"(i) a - taxpayer, whose personal efforts created such property * * *."

He was right in not doing this. In one sense the lease of the play was "created" simply by the agreed advance of $1500. If it be said that this is too narrow an approach and that we must consider what Ferrer would have had to do in order to make the lease productive, the result remains the same. Although the Dramatic Production Contract demanded Ferrer's personal efforts in the play's production, much else in the way of capital and risk-taking was also required. Yet the legislative history, see S.Rep. No. 2375, 81st Cong., 2d Sess., printed in 2 U.S.Code Cong.Serv. p. 3053 (1950), shows that § 117(a) (1) (C), initially added by the Revenue Act of 1950, 64 Stat. 906, 933, was intended to deal with personal efforts and creation in a rather narrow sense.[5] See Stern v. United States, 164 F.Supp. 847, 851 (E.D.La. 1958), aff'd per curiam, 262 F.2d 957 (5 Cir.), cert. denied, 359 U.S. 969, 79 S.Ct. 880, 3 L.Ed.2d 836 (1959); McPeters, Taxation of Literary Property Income, 12 Mercer L.Rev. 370, 375–380 (1961); and Rev.Rul. 55–706, 1955–2 Cum.Bull. 300. Ferrer's role as producer, paying large sums to the theatre, the actors, other personnel, and the author, is not analogous to that of the writer or even the "creator" of a radio program mentioned by the Committee. Moreover, the dramatic producer does not normally "sell" the production to a single purchaser, as an author or radio program "creator" usually does—he offers it directly to public custom.

We see no basis for holding that amounts paid Ferrer for surrender of his lease of the play are excluded from capital gain treatment because receipts from the play would have been ordinary income. The latter is equally true if a lessee of real property sells or surrenders a lease from which he is receiving business income or subrentals; yet Golonsky and McCue Bros. & Drummond held such to be the sale or exchange of a capital asset, as § 1241 now provides.

---

5. The Committee introduced its discussion by referring to persons "in the profession of writing books, or creating other artistic works." It then discussed the previous law, whereby an "amateur" can sell "his book or other artistic work" after holding it for 6 months, and thereby receive "long-term capital gain treatment on the product of his personal effort," p. 3097. The bill therefore provided "that when any person sells a book or other artistic work which is the product of his personal effort his income from the sale is taxed as ordinary income." At p. 3140, the Committee characterized its handiwork as follows:

"Under the committee amendment, a person who writes a book or creates some other sort of artistic work will be taxed at ordinary income rates, rather than at capital-gain rates, upon gain from the sale of the work regardless of whether it is his first production in the field or not. The amendment made by section 211 (a) will also exclude from the capital asset category any property similar to that specifically named; for example, a radio program which has been created by the personal efforts of the taxpayer * * * The interest of a sole proprietor in such a business enterprise as a photographic studio is not 'similar property' even though the value of the business may be largely attributable to the personal efforts of the sole proprietor."

Likewise we find nothing in the statute that forbids capital gain treatment because the payment to Ferrer might be spread over a number of years rather than coming in a lump sum; although prevention of the unfairness arising from applying ordinary income rates to a "bunching" of income may be one of the motivations of the "capital gain" provisions, the statute says nothing about this. Compare Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931). Finally, with respect to the lease of the play, there was no such equivalence between amounts paid for its surrender and income that would have been realized by its retention as seems to lie at the basis of the Tenth Circuit's recent refusal of capital gain treatment in Wiseman v. Halliburton Oil Well Cementing Co., 301 F.2d 654 (1962), a decision as to which we take no position.

(2) Ferrer's negative power, as an incident to the lease, to prevent any disposition of the motion picture, radio and television rights until after production of the play, was also one which, under the cases previously cited, as well as Harper Bros. v. Klaw, 232 F. 609, 613 (S.D.N.Y. 1916) and Manners v. Morosco, 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590 (1920), would be protected in equity unless he had contracted to the contrary, and would thus constitute an "equitable interest" in this portion of the copyright. Although we should not regard Articles IV, § 1(a) and VIII as outlawing equitable relief to protect the rights granted as to the play, a literal reading of Article V, § 1(c), quoted above, would negate Ferrer's power to enjoin disposition of the motion picture rights prior to production of the play and would remit him to arbitration —a consequence serious from the standpoint of definition of a capital asset, especially in view of the emphasis we placed in Pittston, 252 F.2d at 348, on the unavailability of injunctive relief there. In the absence of authority, we should not read the clause so broadly; we would construe it as relating to disputes as to the manner of disposition of the rights after the Negotiator had become entitled to dis-

pose of them, not as closing the door on the only effective method for protecting the Manager's important interest against premature disposition. As a practical matter, this feature of the Dramatic Production Contract "clouded" LaMure's title, despite the Contract's contrary assertion. Huston would not conclude with LaMure and LaMure would not conclude with Huston unless Ferrer released his rights; Huston's attorney testified that a contract like Ferrer's "imposes an encumbrance on the motion picture rights." Ferrer's dissipation of the cloud arising from the negative covenant seems analogous to the tenant's relinquishment of a right to prevent his landlord from leasing to another tenant in the same business, held to be the sale or exchange of a capital asset in Ray. What we have said in (1) with respect to possible grounds for disqualification as a capital asset is *a fortiori* applicable here.

(3) We take a different view with respect to the capital assets status of Ferrer's right to receive 40% of the proceeds of the motion picture and other rights if he produced "Monsieur Toulouse."

We assume, without deciding, that there is no reason in principle why if the holder of a copyright grants an interest in the portion of a copyright relating to motion picture and other rights contingent on the production of a play, or, to put the matter in another way, gives the producer an option to acquire such an interest by producing the play, the option would not constitute a "capital asset" unless the producer is disqualified by § 117(a) (1) (A), now § 1221(1). Although the copyright might not be such an asset in the owner's hands because of that section or § 117(a) (1) (C) (i), now § 1221(3) (A), the latter disqualification would not apply to the producer for reasons already discussed, and the former would not unless the producer was a professional. However, it is equally possible for the copyright owner to reserve the entire "property" both legal and equitable in himself and agree with the producer that a percentage of certain avails shall be paid as further income from the lease of the play

—just as the lessor of real estate might agree to pay a lessee a percentage of what the lessor obtained from other tenants attracted to the building by the lessee's operations. In both instances such payments would be ordinary income. If the parties choose to cast their transaction in the latter mold, the Commissioner may take them at their word.

Here the parties were at some pains to do exactly that. LaMure was to "retain for his sole benefit, complete title, both legal and equitable, in and to all rights whatsoever" other than the right to produce the play. Ferrer was to "have no right, title or interest, legal or equitable, in the motion picture rights, other than the right to receive the Manager's share of the proceeds"; even as to that, he was to have "no recourse, in law or in equity" against a purchaser, a lessee, or the Negotiator, but only a right to arbitration against the Author. We cannot regard all this as mere formalism. The Contract is full of provisions designed to emphasize the Negotiator's freedom to act—provisions apparently stemming from a fear that, without them, the value of the motion picture rights might disintegrate in controversy. McClintic v. Sheldon, 269 App.Div. 356, 55 N.Y.S.2d 879 (1st Dept. 1945), aff'd, 295 N.Y. 682, 65 N.E.2d 328 (1946), greatly relied upon by the taxpayer, does not show that, despite the contrary language of the Contract, Ferrer had, or ever would have, an affirmative equitable interest in the motion picture or other rights, as distinguished from his temporary negative "encumbrance" on them. Although the Appellate Division's opinion contains some remarks as to the equitable interest of a licensee in a copyright, these were not essential to the holding, namely, that "the clear language" of the agreement entitled the producer to the moneys there in question. Moreover, examination of the papers on appeal shows that the contract between the producer and the author in that case was an earlier form not containing the extensive negation of equitable property interests present here.[6]

It follows that if Ferrer had produced the play and LaMure had sold the motion picture, radio and television rights for a percentage of the profits, Ferrer's 40% of that percentage would have been ordinary income and not the sale or exchange of a capital asset. The decisions in Hort and Holt point to what would seem the inevitable corollary that if, on the same facts, Ferrer had then sold his rights to a percentage of the profits for a lump sum, that, too, would have been ordinary income, see Herman Shumlin, 16 T.C. 407 (1951). The situation cannot be better from Ferrer's standpoint because he had merely a contingent right to, or an option to obtain, the 40% interest; the case differs from Dorman v. United States, supra, in that there the option was to acquire what would admittedly have been a "capital asset."

The situation is thus one in which two of the rights that Ferrer sold or exchanged were "capital assets" and one was not. Although it would be easy to say that the contingent contract right to a percentage of the avails of the motion picture, radio and television rights was dominant and all else incidental, that would be viewing the situation with the inestimable advantage of hindsight. In 1952 no one could tell whether the play might be a huge success and the picture a dismal failure, whether the exact opposite would be true, whether both would succeed or both would fail. We cannot simply dismiss out of hand the notion that a dramatic production, presenting an actor famous on the speaking stage and appealing to a sophisticated audience, might have had substantial profit possibilities, perhaps quite as good as a film with re-

6. The "Additional Clause" summarized at the end of our analysis of the Dramatic Production Contract does not call for a different conclusion, as Ferrer urges. This simply protected Ferrer against La- Mure's dealing with the novel without regard to Ferrer so long as LaMure did not deal with the play; the clause did not alter the character of Ferrer's rights with respect to LaMure's copyright.

spect to a figure, not altogether attractive and not nearly so broadly known then as the success of the picture has made him now, which presumably would require wide public acceptance before returning production costs. At the very least, when Ferrer gave up his lease of the play, he was abandoning his bet on two horses in favor of a bet on only one.

■■■ In such instances, where part of a transaction calls for one tax treatment and another for a different kind, allocation is demanded, Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Ditmars v. C. I. R., 302 F.2d 481 (2 Cir. 1962). If it be said that to remand for this purpose is asking the Tax Court to separate the inseparable, we answer that no one expects scientific exactness; that however roughly hewn the decision may be, the result is certain to be fairer than either extreme; and that similar tasks must be performed by the Tax Court in other areas, see Webster Investors, Inc. v. C. I. R., 291 F.2d 192 (2 Cir. 1961); Meister v. C. I. R., 302 F.2d 54 (2 Cir. 1962) [determination of portion of purchase price attributable to good-will].

Still we have not reached the end of the road. The Commissioner contends that, apart from all else, no part of the payments here can qualify for capital gain treatment, since Ferrer could receive "percentage compensation" only if he fulfilled his acting commitments, and all the payments were thus for personal services. Citing C. I. R. v. Dwight's Estate, 205 F.2d 298, 301 (2 Cir.), cert. denied, 346 U.S. 871, 74 S.Ct. 121, 98 L. Ed. 380 (1953), the Commissioner says it was error for the Tax Court to rely on extrinsic evidence to vary the written contract.

Although the parties have taken opposing positions on the applicability of the "parol evidence rule" to a dispute involving a stranger to the contract, a question discussed by Professor Corbin in his usual illuminating fashion in 3 Contracts (rev.ed. 1960) § 596, cf. 9 Wigmore, Evidence (3d ed. 1940) § 2446, at p. 150, and see, with respect to tax controversies, Stern v. C. I. R., 137 F.2d 43, 46 (2 Cir. 1943); Scofield v. Greer, 185 F.2d 551, 552 (5 Cir. 1950); Landa v. C. I. R., 92 U.S.App.D.C. 196, 206 F.2d 431, 432 (1953); Mustard v. United States, 155 F. Supp. 325, 332 (Ct.Cl.1957); Thorsness v. United States, 260 F.2d 341, 345 (7 Cir. 1958); Cooper Foundation v. O'Malley, 121 F.Supp. 438, 444 (D.Neb.1954), no such issue is here presented. No one argued the contract provided anything other than what was plainly said. Huston's attorney did not assert that Ferrer would become entitled to the percentage compensation without fulfilling his acting commitment; what the attorney said in his testimony, as he had earlier in his letter, was that Ferrer was selling two things to Moulin—his services as an actor and his rights under the Dramatic Production Contract—and that the parties regarded the payments under clauses 4 (a), (b) and (c) as the consideration for the former and those under clauses 4(d) and (e) as the consideration for the latter.

■ On the basis of this evidence the Tax Court found that the percentage compensation was not "to any extent the consequence of, or consideration for, petitioner's personal services." In one sense, this is hardly so. Under the Motion Picture Contract, Ferrer would receive no percentage compensation if he wrongfully refused to furnish acting services, and none or only a portion if, for reasons beyond his control, he furnished less than all. Since that must have been as plain to the Tax Court as to us, we read the finding to mean rather that Ferrer and Moulin adopted the percentage of profits formula embodied in clauses 4(d) and (e) as an equivalent and in lieu of a fixed sum payable in all events for the release of the Dramatic Production Contract. If they had first agreed on such a sum and had then substituted the arrangement here made, it would be hard to say that although payments under their initial ar-

rangement would not be disqualified for capital gain treatment, payments under the substituted one would be. Ferrer was already bound to play the role of Toulouse-Lautrec, at a salary implicitly found to constitute fair compensation for his services; adoption of a formula whereby his receipt of percentage compensation for releasing his rights was made contingent on his fulfilling that undertaking does not mean that the percentage compensation could not be solely for his release of the Contract. The Tax Court was not bound to accept the testimony that this was the intent—it could lawfully have found that the percentage compensation was in part added salary for Ferrer's acting services and in part payment for the release. However, it found the contrary, and we cannot say that in doing so it went beyond the bounds to which our review of its fact findings is confined, Internal Revenue Code of 1954, § 7482(a), 26 U.S.C.A. § 7482(a); F.R.Civ.Proc. 52(a). Since, on the taxpayer's own evidence, the percentage compensation was for the totality of the release of his rights under the Dramatic Production Contract, allocation is required as between rights which did and rights which did not constitute a "capital asset."

We therefore reverse and remand to the Tax Court to determine what portion of the percentage compensation under clauses 4(d) and (e) of the Motion Picture Contract constituted compensation for Ferrer's surrendering his lease of the play and his incidental power to prevent disposition of the motion picture and other rights pending its production, as to which the determination of deficiency should be annulled, and what part for the surrender of his opportunity to receive 40% of the proceeds of the motion picture and other rights as to which it should be sustained. The expenses allowed as basis must likewise be allocated. Doubtless further evidence will have to be taken unless the parties can reach some practical adjustment.

It is so ordered.