**BILLY ROSE'S DIAMOND HORSESHOE, INC. (In Dissolution), Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 69 Civ. 1303.**

United States District Court,
S. D. New York.

Jan. 8, 1971.

Hays, St. John, Abramson & Heilbron, by Osmond K. Fraenkel, New York City, for plaintiff.

Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, by Michael I. Saltzman, Asst. U. S. Atty., for defendant.

RYAN, District Judge.

Plaintiff has moved for summary judgment for recovery of internal revenue taxes which it alleges were illegally assessed and collected.

Defendant has cross-moved for summary judgment, dismissing the complaint.

Plaintiff, Billy Rose's Diamond Horseshoe, Inc., was a New York corporation. It had its principal place of business in this District. It was dissolved on December 15, 1966, but under Section 1006 of the New York Business Corporation Law, McKinney's Consol. Laws, c. 4, it may maintain this action.

This action was filed on March 31, 1969. Service of process was made on the United States of America, who appeared and filed its answer on July 7, 1969.

Jurisdiction and venue is not contested. Plaintiff's claim for refund was filed timely on November 4, 1965, within the limitation period of Section 6511 (d) (2) of the Internal Revenue Code of 1954.

Following conferences between the attorneys and the Court, the parties on October 27, 1970 filed a stipulation as to facts. It appears from the pleadings and from the papers now submitted that additional facts are not in dispute. I find no factual issue. There is a single question of law presented.

Plaintiff maintained its books and reported on a fiscal year basis, ending on August 31st of each year.

Plaintiff seeks the return of $24,913.-78 and interest, claiming improper rejection by the Internal Revenue Service of a net operating loss carryback from the fiscal year ending August 31, 1962 to the fiscal year ending August 31, 1959. It is not in dispute that, if that carryback had been allowed, the corporation would have had no taxable income for the fiscal year ending August 31, 1962 and the payment of $24,913.78 tax assessed for that year would be recoverable.

The Service maintained that three notes, one for $100,000 payable September 4, 1962; one ofr $50,000 payable January 7, 1963; and one for $150,000 payable September 1, 1963—all of which were paid when due—received by plaintiff from National Broadcasting Company, Inc., under an agreement between them dated June 28, 1962, must be included in plaintiff's taxable income for the fiscal year ending August 31, 1962. Plaintiff does not dispute that the notes were income for federal income tax purposes. The issue raised is in what taxable year or years the amount of the notes is to be included in plaintiff's gross income.

It is not in dispute that by agreement of August 26, 1955, plaintiff leased premises known as the Ziegfeld Theatre to the National Broadcasting Company for a term ending on October 31, 1962. Under the lease, N.B.C. covenanted to surrender " * * * the demised premises * * * in good order and repair and in approximately the same condition as received by the lessee, depreciation and reasonable wear and tear excepted."

It is undisputed that N.B.C. took possession of the demised premises and made substantial physical structural changes and alterations. It broke down walls for installation of color television cable equipment; it took out all orchestra seats; it broke up the stage and lower lounge, replacing them with concrete floors; rebuilt the dressing rooms; and reconstructed two floors backstage to install a new air conditioning system. All of the work was done without objection of plaintiff as within N.B.C.'s rights under the lease.

Plaintiff and N.B.C. on June 28, 1962 entered into two agreements.

One agreement, described as the "Settlement Agreement", provided for the settlement of "various rights and obligations" of plaintiff, lessee, and Billy Rose, who was a sublessee under the lease. It provided for the termination of the lease and the surrender of the premises, and then in paragraph "3" of the Settlement Agreement, there was a mutual remise, release and discharge of the parties from all actions which each of the parties could have against the other arising out of the

lease. One of several covenants which was excepted from and which survived the release was the lessee's obligation to return the premises in the same condition as when received under the lease.

The second agreement, called the "Compromise Agreement", provided for the lessee's delivery of three promissory notes in the total amount of $100,000 in "full satisfaction and compromise of [lessee's] obligation to restore the Ziegfeld Theatre to approximately the same condition as the same was in when received by [lessee] as required by paragraph Twenty-Third of said lease, and by paragraph 3(c)" of the Settlement Agreement, to which plaintiff and lessee and Billy Rose were parties.

Plaintiff, in its income tax return for its fiscal year ending August 31, 1962, elected the installment method of reporting the receipts under the Compromise Agreement. Plaintiff received no payments on the notes in its fiscal year ending August 31, 1962 and it reported no income with respect to the transaction for that year. Plaintiff for that fiscal year did report a net operating loss of $111,452.50. It then filed a claim for refund of taxes for its taxable year ending August 31, 1959, the year in suit here, based on the carryback of its fiscal year 1962 net operating loss.

Plaintiff included the proceeds of the first two notes in its income tax return for the fiscal year ending August 31, 1963 and the proceeds of the third note were included in its income tax return for the fiscal year ending August 31, 1964.

The Commissioner determined that the entire face amount of the notes plaintiff received under the Compromise Agreement was reportable in its fiscal year ending August 31, 1962 as ordinary income, and this eliminated the claimed net operating loss reported by plaintiff. Plaintiff's claim for refund for its fiscal year 1959 was accordingly rejected, and this action was filed.

To restate the controversy: The Internal Revenue Service contends that the value or amount of these notes should be included in plaintiff's income in the taxable year in which they were delivered, to wit, fiscal year ending August 31, 1962. Plaintiff claims that it is entitled to elect to treat the transaction on an installment basis and that the taxable years after the year of delivery are the years in which the income should be reported, i. e., in the taxable years 1963 and 1964, when the notes were actually paid. The answer to these contentions is decisive of this action, for if plaintiff's claim is disallowed, not only does the additional income wipe out plaintiff's net operating loss for its taxable year 1962, but plaintiff also loses the advantage of a carryback loss to the taxable year in suit, fiscal year ending August 31, 1959.

■ The question presented is whether the "compromise" of the claim against lessee under the lease restoration clause is a "casual sale or other casual disposition" or real or personal "property" which entitled the plaintiff to elect the installment method of accounting.

The answer lies in the interpretation of Section 453(a) and (b) to the undisputed facts. We quote the statute in the footnote.[1]

---

1. Section 453(a) and (b).
    (a) Dealers in personal property.—
      (1) *In general.*—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

    \*    \*    \*    \*    \*

    (b) Sales of realty and casual sales of personalty.—
      (1) General rule—Income from—
      (A) a sale or other disposition of real property, or
      (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory

We start with the premise that a taxpayer properly electing the installment method need only report as income the proportion of installment payments actually received in that year which the gross profit realized bears to the total contract price.

The installment method of accounting applies to Section 453(b) (1) (A), (B):

"(b) Income from

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property * * *".

Plaintiff compromised its rights under the lease restoration clause. Plaintiff gave up a right it could have enforced under the lease restoration clause only by the filing of a suit to recover a sum of money; the transaction was a release and satisfaction of that right.

I conclude that, whether the transaction is a compromise, satisfaction or a release, it does not qualify as a "sale" or "other casual disposition" within the meaning of the installment sales provisions, and that plaintiff is not entitled to elect that method of reporting this income.

Nowhere in the installment sale section or elsewhere in the Code is the term "sale" defined. A sale in the context of the capital gains provisions, Section 1222(3), which requires inter alia, a "sale or exchange" of property before granting special tax treatment, has been defined in Commissioner of Internal Revenue v. Brown (1965), 380 U.S. 563, at 571, 85 S.Ct. 1162, at 1166, 14 L.Ed. 2d 75:

"' "A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent," Iowa v. McFarland, 110 U.S. 471, 478 [4 S.Ct. 210, 214, 28 L. Ed. 198]; it is a contract "to pass rights of property for money,—which the buyer pays or promises to pay to the seller * * *," ' Williamson v. Berry, 8 How. 495, 544, [12 L.Ed. 1170]."

The absence here of a "transfer of property" is manifest; the lessee obtained nothing which could be denominated property or a right to property after the transaction. All that it had was the acquittance of a contract obligation.

It has long been held in this Circuit that the cancellation or release of contract rights does not transfer the rights to the transferee-payor and is not a "sale"; the rights are simply extinguished and vanish.[2] Pittston Co. v. Commissioner of Internal Revenue, 252 F.2d 344 (1958), cert. denied, 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364 (can-

---

of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) Limitation—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. .

(B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the income was (by reason of section 44(b) of the Internal Revenue Code of 1939) returnable on the basis and in the manner prescribed in section 44 of such code.

* * * * *

2. The Second Circuit has, however, created a distinction between leases and other contract rights, finding a "sale" in the cancellation of a lease because more substantial property rights are involved which do not lose their existence when transferred. Commissioner of Internal Revenue v. McCue Bros. & Drummond, Inc., 210 F.2d 752 (1954); and similarly, McAllister v. Commissioner of Internal Revenue, 157 F.2d 235 (1946) (sale of life interest to remainderman).

cellation of exclusive right to purchase coal output); General Artists Corp. v. Commissioner of Internal Revenue, 205 F.2d 360 (1953), cert. denied, 346 U.S. 866, 74 S.Ct. 105, 98 L.Ed. 376 (release of singer under exclusive booking agency); Commissioner of Internal Revenue v. Starr Bros., Inc., 204 F.2d 673 (1953) (cancellation of distributorship agreement); cf. Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125 (1962).[3]

The Circuit Court in *Starr Bros.* stated (204 F.2d at 674):

> "What the taxpayer gave in return for the cash payment was a release of United's contract obligations, chief of which was its promise not to sell its products to other dealers in New London. Such release not only ended the promisor's previously existing duty but also destroyed the promisee's rights. They were not transferred to the promisor; they merely came to an end and vanished."

Here, two things were accomplished by the agreements of June 28, 1962. The lessee was released of its obligation under the lease restoration clause and plaintiff's right to have the property restored was surrendered. No property was sold or transferred.

It has been held in comparable situations that the termination of a taxpayer's obligation for cash without a transfer of property to the taxpayer is not a "sale or exchange". Thus, a redemption of bonds before maturity by the issuing corporation was held not to be a "sale or exchange", Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855 (1939); or the receipt of monies on ma-

turity of an endowment policy, Blum v. Higgins, 150 F.2d 471 (2d Cir. 1945); or the acquisition of a promissory note by the maker, Bingham v. Commissioner of Internal Revenue, 105 F.2d 971 (2d Cir. 1939); or the receipt of liquidated damages on default of a purchase contract, Ralph A. Boatman, 32 T.C. 1188 (1959). See also, Hale v. Helvering, 66 App.D.C. 245, 85 F.2d 822 (1936); and Shirley D. Hudson, 20 T.C. 734 (1953).

The term "other disposition" in the installment sales provisions is of no help to plaintiff because it is qualified by its antecedent "sale". Harry Leland Barnsley, 31 T.C. 1260, 1263 (1959). The phrase "other disposition" has reference to a transaction which, when finally completed, will result in a disposition of title to property, though it may at the time of its consideration for tax purposes, be something less than a completed sale. The transaction involved here was not a "sale", nor was it a "disposition" of property within the statute.

I conclude that in the Second Circuit the release of a contract right is not a sale. The holdings of General Artists Corp. v. Commissioner of Internal Revenue and Commissioner of Internal Revenue v. Starr Bros., *supra*, in this Circuit, that the release or cancellation of a naked contract right is not a "sale", have not been changed by the subsequent enactment of Section 1241 or overruled in the Second Circuit by Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125 (1962). Congress changed and limited the effect of both *Starr Bros.* and Commissioner of Internal Revenue v. Golonsky, 200 F.2d 72 (3rd Cir. 1952), cert. denied, 345 U.S. 939, 73 S.Ct. 830,

---

3. The position of the Second Circuit has been followed in the Ninth Circuit (Leh v. Commissioner of Internal Revenue, 260 F.2d 489 (1958)); and apparently by the Tenth Circuit (Wiseman v. Halliburton Oil Well Cementing Co., 301 F.2d 654); and the Court of Claims (Appalachian Electric Power Co. v. United States, 158 F.Supp. 138, 141 Ct.Cl. 367 (1958)). On the other hand, the Third Circuit apparently rejects the *Starr Bros.* line of cases (Commissioner of Internal Revenue v. Goff, 212 F.2d 875 (1954)), and the Fifth Circuit does also (United States v. Dresser Industries, Inc., 324 F.2d 56 (1963)) although it followed the Second Circuit rule at one time (Roscoe v. Commissioner of Internal Revenue, 215 F.2d 478 (1954)). This explains the different result reached by the Fifth Circuit in Commissioner of Internal Revenue v. Ray, 210 F.2d 390 (1954), cited by plaintiff.

97 L.Ed. 1366, when it provided in Section 1241 that

"Amounts received by a lessee for the cancellation of a lease, or by a distributor of goods for the cancellation of a distributor's agreement (if the distributor has a substantial capital investment in the distributorship), shall be considered as amounts received in exchange for such lease or agreement."

The Senate Report (S.Rep.1622, 83rd Cong., 2d Sess., at 115 (1954)) on Section 1241, makes special note of the fact that

"The section is limited in scope and it does not constitute a re-examination of present law relating to contracts to which the section does not specifically apply." U.S.Code Cong. & Admin. News 1954, p. 4749.

It was the plain intent of the Congress that the cancellation of a contract right other than the cancellation of a lease or a distributorship agreement (neither of which is involved in this case) is to be governed by the case law.[4]

The Second Circuit in 1962, when considering whether capital gains treatment should be accorded payments received with respect to a motion picture, noted that the trend of decisions in the capital gains area where both a "capital asset" and a "sale or exchange" are prerequisites, was to move away from the distinction between a sale and release; *General Artists* and *Starr Bros.*, *supra*; toward an examination as to whether the property rights transferred constituted a "capital asset"; Commissioner of Internal Revenue v. Ferrer, *supra*. I agree with Internal Revenue Service that *Ferrer* did not overrule *General Artists* and *Starr Bros*, *supra*, which held that a release is not a "sale".[5]

The Second Circuit Court of Appeals in *Ferrer* held that capital gains treatment will turn directly on the character of the asset regardless of the nature of the disposition (especially where, under the facts, it is found that there is "no sensible business basis" for distinguishing between a hypothetical sale and the disposition (a release) which actually took place. In sum, in capital gains cases, the focus in the Second Circuit has been on the type of property, not the nature of the disposition. However, in the instant case, the focus is on the nature of the disposition (i. e., whether it was a "sale" for the purposes of installment sales provisions), and the *General Artists* and *Starr Bros.* cases still speak with authority to that question, irrespective of what the holding may be when the question of capital gains treatment is raised. Here, unlike *Ferrer* there is a "sensible business basis" for distinguishing between the release which occurred and the sale which did not.

Plaintiff had the contract right to have the theatre restored. A sale of that right to a third person had no practical or legal significance independent of the underlying leasehold. There could have been no sale to a third person since no one could enforce that right of restoration unless it owned the leasehold. To the contrary, Ferrer could have sold his "lease" of the production rights to any third person.

Neither the passage of Section 1241 nor the *Ferrer* case, under the facts here, prevent the finding that plaintiff's release of the lessee was not a "sale".

■ The installment sales provisions were intended to provide relief for dealers in personal property who regularly sold on the installment plan and who otherwise would be required to accrue substantial amounts of income without the benefits of having received the cash payments. This relief treatment was also extended to sales of real property and casual sales of personal property. The term "personal property" in the install-

---

4. For this reason, *Golonsky, supra,* cited by plaintiff, is inapposite.

5. After *Ferrer,* the Second Circuit cited the *General Artists* and *Starr Bros.* cases in Brook et al. v. Commissioner of Internal Revenue et al., 360 F.2d 1011 (1966).

ment sales provisions means the same thing whether the sale is made by a dealer (Section 453(a) (1)), or, as here, by a person who sells the property in an isolated transaction (Section 453(b) (2) (B)). The contract right to have leased premises returned in the same condition as leased is not the kind of property tangible or intangible, commonly dealt in by a dealer, and the contract right involved here is not the kind of property meant even if sold in a casual sale.

The taxpayer has the burden of proving that it is entitled to this special relief of installment sales treatment. There is no authority or legislative history to indicate that Congress ever intended to extend it to settlements of mere choses-in-action or to assist a taxpayer to adjust its income pattern when it is perfectly apparent that it is done solely to obtain installment sale treatment of what otherwise would have been income includable in the year in which the settlement was reached.

I conclude that plaintiff is not entitled to relief of the installment sales provisions.

Plaintiff did not have to utilize the amount of the notes to repair the premises; it had a choice not offered if the premises had been returned to it in a restored condition. While plaintiff did not sell or dispose of property, it dealt with property and therefore realized gross income. Section 61(a) (3).[6]

If plaintiff had decided in a later taxable year to restore the premises to their former condition by repair, it would be entitled to deduct the expenses incurred. If plaintiff had decided to restore the premises in the same taxable year as the settlement and the expenses incurred equalled the amount of the settlement, the income and deductions would be offsetting.

The plaintiff received a settlement in lieu of restoration; it did not restore the premises and the plaintiff must pay a tax on the settlement. Section 61(a) (3).[7]

Plaintiff's motion for summary judgment is denied; defendant's motion is granted. Settle judgment on 10 days' notice.

---

6. Section 61(a) (3) provides that gross income "means all income from whatever source derived, including (but not limited to) the following items:
   (3) gains derived from dealings in property; * * *."

7. I find Hamilton & Main, Inc., 25 T.C. 878 (1956) entirely inapposite. Here, there was no sale of the leased premises and assignment of the right of restoration under the lease to the purchaser.