SIRBO HOLDINGS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 515–69.   Filed January 27, 1972.

*Lester H. Salter*, for the petitioner.
*Marwin A. Batt* and *Marion L. Westen*, for the respondent.

QUEALY, *Judge:* The respondent determined a deficiency in the Federal income tax of the petitioner in the amount of $53,573.30 for the taxable year ended June 30, 1964.

The issue presented for decision is whether the petitioner is entitled to capital gain treatment for a payment of $125,000 from its tenant or whether this amount is taxable to the petitioner as ordinary income.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are herein incorporated by this reference.

The petitioner, Sirbo Holdings, Inc. (hereinafter referred to as the petitioner), is a New York corporation with its principal office located in New York, N.Y. Petitioner filed a timely U.S. Corporation Income Tax Return for its taxable year ended June 30, 1964, with the district director of internal revenue for the district of Manhattan, New York.

At all times pertinent hereto, the petitioner maintained its books and records and filed its Federal income tax returns on the accrual method of accounting. Petitioner was incorporated on July 8, 1944. At all times pertinent hereto, the petitioner was engaged in the business or trade of renting real estate.

On or about July 8, 1944, the petitioner purchased commercial property located at 254 West 54th Street, 258 West 54th Street, and 229–237 West 53d Street, New York, N.Y., at a cost of $400,000. This property consisted of land and a building; the building is comprised of offices and a theater known as the New Yorker Theatre. The building was used in the petitioner's trade or business of renting real estate, and petitioner appointed Byron-Boyce Co., Inc., as agent with respect to the premises.

The New Yorker Theatre (hereinafter referred to as the theater) was built in the 1920's and was physically constructed to function as a legitimate theater. When the petitioner purchased the building in which the theater was located, it acquired the theater subject to a lease granted to the Columbia Broadcasting System, Inc. (hereinafter referred to as CBS), by the prior owner of the theater, the Bowery Savings Bank. The lease term had commenced on September 7, 1943, and was to terminate on September 12, 1948.

Under the terms of the 1943 lease, CBS, as the tenant, had the right to use the theater over the term of the lease "as a theatre, and for radio broadcasting and television purposes, and kindred purposes, and for the general purposes of its business." It was expressly understood that extensive structural as well as nonstructural changes would be made in the theater. With respect to such changes, the lease provided:

At the expiration or other termination of the term hereby granted, the TENANT shall and will leave the said premises and the theatre whole and in

good order and condition and will remove therefrom every and all its equipment, goods and effects, and those of all persons claiming under it, and will deliver up the demised premises in as good order and conditions as reasonable wear and tear and damage by the elements will permit, * * * provided, however, that the TENANT shall restore the premises substantially to the condition in which they exist at the time of the making of this lease, reasonable wear and tear and damage by the elements excepted, all in accordance with the requirements of the LANDLORD, and the TENANT shall fully indemnify the LANDLORD for every and all costs and expenses of whatsoever name or nature that may be required for the purpose of reinstating the premises to said condition in which they now exist.

On November 14, 1947, the petitioner and CBS executed a new lease for the theater to commence September 13, 1948, for a period of 5 years terminating on September 12, 1953. The annual rental under the lease was $50,000 a year. Under the terms of this lease agreement, the tenant continued to have the right to use the theater as a theater and for radio-broadcasting and television purposes. Upon the expiration of this lease, the tenant was to restore the premises substantially to the condition in which they existed at the time of the making of the lease, reasonable wear and tear excepted, and in accordance with the requirements of the landlord. The tenant was also to indemnify the landlord for all costs and expenses which were required for reinstating the premises to the condition which existed prior to the tenant's occupancy.

Some time after November 14, 1947, CBS began to make changes in the physical arrangement of the theater in order to adapt the theater for use by CBS as a television studio. These changes included the removal of approximately 300 to 400 theater seats, the elimination of all carpeting, chandeliers, and stage curtains; the extension of the stage area into what was formerly the audience area, a change in the floor level and the elimination of the "loop" in the former seating arrangement, the construction of walls and partitions and appropriate structural changes to accommodate control rooms, the alteration of bathrooms and the heating system, and the installation of thousands of feet of electrical wiring.

On August 14, 1953, the petitioner and CBS executed a new lease for a term of 5 years and 18 days commencing September 13, 1953. Pursuant to this lease, the tenant, upon the expiration of the lease term, was required to remove all of its equipment, goods and effects, and all scenery, stage hangings, properties, decorations and equipment, including radio and audio equipment installed and paid for by the tenant. The tenant was also required to restore the premises substantially to the condition in which they existed at the making of the lease, reasonable wear and tear and damage by the elements excepted. In addition, the tenant was to fully indemnify the landlord for all

costs and expenses which were required for reinstating the premises to their prior condition. Finally, the tenant agreed to restore any and all seats which it had removed, to remove the control booths which it had installed, and to remove the extension of the stage apron which it had constructed. On July 17, 1958, the petitioner and CBS agreed to extend the term of this 1953 lease to December 31, 1958, upon the same terms and conditions.

On July 15, 1958, the petitioner and CBS entered into a new lease for the theater to commence January 1, 1959, for a period of 3 years. The termination or expiration clause of the lease was similar to the termination clause in the prior lease. The tenant was required to remove all of its equipment and to restore the premises to the condition in which they existed on November 14, 1947. The tenant was also required to fully indemnify the landlord for any expense required to reinstate the premises to the condition in which they existed on November 14, 1947. Furthermore, the tenant agreed to restore any and all seats which it had removed, to remove the control booths which it installed, and to remove the stage apron extension which it had constructed.

In a letter dated December 20, 1960, CBS notified the petitioner that it was exercising its option to extend the 1959 lease for 2 years. The period of the extension was to commence on January 1, 1962, and terminate December 31, 1963. The petitioner agreed to the extension on December 24, 1960.

Prior to December 31, 1963, CBS determined as a matter of corporate policy to eliminate restoration clauses from leases which it held on theaters in New York. In turn, CBS advised the petitioner that it wished to eliminate the restoration clause in the lease of the theater.

Before undertaking negotiations with respect to the restoration clause, the petitioner and CBS undertook to negotiate a new lease for the continued occupancy of the theater by CBS for the period from January 1, 1964, to December 31, 1968. As a result of these negotiations, CBS sent to the petitioner a letter, under date of December 24, 1963, to serve as a memorandum of understanding with respect to the provisions of a new lease to be entered into between the petitioner and CBS and to commence on January 1, 1964. Under the terms set forth therein, there was to be no obligation on the part of the tenant to restore the premises on the termination of the new lease, except as to conditions as they existed on January 1, 1964, i.e., the time of the commencement of the lease.

After the basic provisions of the new lease had been agreed upon by the petitioner and CBS in December 1963, the parties entered into negotiations with respect to the amount to be paid by CBS for "up-dating" the restoration clause in the 1963 lease. As the result of

534

these negotiations, the parties agreed that CBS would pay the petitioner $125,000. In negotiating the $125,000 amount, CBS considered the payment as part of the cost of occupying the theater. At no time during the period of negotiation and agreement did the parties intend or contemplate that the premises would be restored to their condition of November 14, 1947.

Under date of December 23, 1963, CBS sent to the petitioner a letter which referred to enclosed releases from the petitioner to CBS and from CBS to the petitioner which purported to release the parties from any obligations arising under the lease ending December 31, 1963. Both of the releases were to be held in escrow pending the execution of a new lease and a payment by CBS to the petitioner.

The release given by CBS to the petitioner was signed by Clarence G. Hopper, vice president of CBS, on or about December 23, 1963. The notarized "General Release" instrument states that the release was executed December 23, 1963. This release provided that the petitioner was released from all liability arising out of or in connection with a lease dated July 15, 1958, between the petitioner and CBS covering the theater or the use and occupancy of its premises by CBS.

In January 1964, the petitioner by Irving Boyce, president, and CBS by Clarence G. Hopper, vice president, executed a document that was back dated to December 31, 1963. This document was prepared by the law firm of Salter and McGowan which is located in Providence, R.I. At that time, one of the main questions concerning the president of the petitioner was the tax consequences of the payment by CBS, and the back-dated document of December 31, 1963, was prepared with these consequences in mind.

The back-dated document of December 31, 1963, purports to release CBS, as tenant of the theater, from any liability under the July 15, 1958, lease. The signatures of the representatives of the parties were witnessed but not notarized. The document provides in part:

WHEREAS the said lease agreement (as extended) expired and terminated on December 31, 1963, and the Landlord thereupon claimed that the Tenant had partially destroyed the demised premises and requested indemnification from the Tenant for all costs and expenses required to reinstate the premises substantially to the condition in which they existed on November 14, 1947, and the Tenant acknowledged its obligation to so indemnify the Landlord, and

WHEREAS the Landlord and Tenant thereafter independently caused expert appraisals to be made to determine the cost and expense of so reinstating the partially-destroyed premises, and desire to settle the Landlord's claim upon the terms hereinafter set forth,

IT IS THEREFORE AGREED:

1. The Landlord and Tenant hereby compromise, adjust and settle the claim of the Landlord, by the Tenant paying to the Landlord the amount of one hundred twenty-five thousand dollars ($125,000.00).

2. In consideration of the amount of one hundred twenty-five thousand dollars ($125,000.00) * * *, the receipt whereof is hereby acknowledged, the Landlord does hereby remise, release, and forever discharge the Tenant from any and all liability for any and all claims, injury or damage which the Landlord may have by reason of the provisions of paragraph FOURTH [the restoration clause] of the lease agreement dated July 15, 1958, as renewed or extended.

On January 31, 1964, Irving Boyce, then the president of the petitioner, executed a general release before a notary. The release provided that CBS was discharged and released from any liability arising out of:

(1) The July 15, 1958, lease for the theater.

(2) The use, occupancy, alteration, addition, removal, or improvement of the theater or any property or equipment demised thereunder or included therein or appurtenances thereto known or unknown.

On January 31, 1964, the petitioner and CBS executed a lease on the theater which was to be effective from January 1, 1964, for a term of 5 years. The rental fee was established at $85,000 a year. Except for the restoration clause, the terms of the January 1, 1964, lease were similar to the provisions of the 1953 and 1959 leases. The termination clause of the January 1, 1964, lease states:

At the expiration or other termination of the term hereby granted, Tenant shall and will leave the said premises and the theatre whole and in good order and condition, reasonable wear and tear and damage by the elements excepted, and if requested by the Landlord, will remove therefrom every and all of Tenant's equipment, goods, and effects, it being understood that all scenery, stage hangings, properties, decorations and equipment, including but not limited to cameras, consoles, radio, audio and television technical gear and associated equipment, installed and paid for by Tenant, which may be affixed to or contained in the herein demised premises may, and at the timely request of Landlord shall, be removed by Tenant whether the same constitutes fixtures or not, provided, however, that if and only if Tenant shall make any alterations, installations or additions in or to the demised premises subsequent to January 1, 1964, Tenant shall at the timely request of Landlord remove any such alterations, installations or additions and shall repair any damage caused thereby.

Landlord's requests, hereinbefore referred to, shall be made by written notice delivered to Tenant not later than June 30, 1968. Except as herein otherwise provided, Tenant shall have no obligation whatever of restoration.

Beyond these requirements, the tenant was under no obligation to restore the premises.

Approximately 2 years after entering upon the 1964 lease, CBS made major modifications to the theater in order to make it suitable for use as a color television studio. During the period in question, CBS had other television studios located in the area near the theater which is in the heart of the television-broadcasting industry. As of December 31, 1963, the optimum usage of the theater was as a television studio.

At the time of its purchase of this property in July 1944, the petitioner apportioned its cost basis for the property of $400,000, between land and building, as follows:

| | |
|---|---:|
| Land | $133, 333. 33 |
| Building | 266, 666. 67 |
| | 400,000. 00 |

With respect to that part of the overall cost basis attributable to the building ($266,666.67), the petitioner did not apportion such cost on its books and records as between the offices and the New Yorker Theatre nor has it done so at the present time.

On January 1, 1964, the petitioner's adjusted basis for the entire building (original cost basis of $266,666.67 less depreciation allowed or allowable to January 1, 1964) was $93,333.51.

In its U.S. Corporation Income Tax Return for its taxable year ended June 30, 1964, the petitioner reported as long-term capital gain the excess of the $125,000, described above, over its adjusted basis for the entire building ($93,333.51) of which the theater is a part; in an attachment to that return, the petitioner set out the following:

Capital gain resulting from involuntary conversion as a result of partial destruction of property used in trade or business:

| | |
|---|---:|
| Basis of property converted | $266, 666. 67 |
| Less accumulated depreciation | 173, 333. 16 |
| Adjusted basis of property | 93, 333. 51 |
| Proceeds of involuntary conversion of property | 125, 000. 00 |
| Excess—long-term capital gain | 31, 666. 49 |

In the deficiency notice of November 20, 1968, the Commissioner determined with respect to the income of the petitioner as follows:

It is determined that you realized ordinary income in the amount of $125,000.00 from the payment made to you in that amount by Columbia Broadcasting System, Inc. in lieu of the capital gain of $31,666.49 reported from the involuntary conversion as a result of partial destruction of property used in a trade or business. Therefore, ordinary income is increased $125,000 and capital gain is decreased $31,666.49.

You are allowed additional depreciation in the amount of $4,444.44 for taxable year ended June 30, 1964 * * * on the property known as the New York Theatre which was not claimed on the return due to the alleged involuntary conversion of the property * * *

OPINION

Petitioner acquired an office and theater building in 1944. At that time, and at all times subsequent thereto, the theater was leased to CBS for use as a radio- and television-broadcasting studio. Under the terms

of the various leases between the petitioner and CBS, the lessee, upon a termination of its tenancy, was obligated either to restore the theater to its condition as of the date of the execution of the given lease or to its condition as of a time prior to the execution of the given lease, wear and tear excepted, or to indemnify the lessor for the cost of such restoration.

During the 20 years in which CBS had used the theater, first as a radio studio and subsequently as a television studio, substantial modifications had been made to the interior of the theater. Additional wiring had been installed, the stage had been extended, seats had been removed, carpets taken up, and areas had been enclosed to provide a control room and the other accouterments which were required for use as a television studio theater. There was no showing that these changes had in any way diminished the value of the property but, if anything, had enhanced it.

Prior to the expiration of the term of the then-existing lease on December 31, 1963, CBS concluded as a matter of policy that the so-called "restoration clause" should be eliminated from any new lease. In the ensuing negotiations, the parties first agreed upon the rental to be paid by CBS for the term of the new lease. The parties then entered into negotiations for the deletion of the restoration clause. As a result of such negotiations, it was agreed that CBS would pay the petitioner the sum of $125,000, in consideration of which the petitioner agreed to "update" the restoration clause to require restoration of the property or indemnification for the cost of restoration of the property to its condition as of January 1, 1964.

Petitioner contends that the modifications to the property over the period of the lessee's occupancy were tantamount to an involuntary conversion of its property for which the petitioner received damages in the amount of $125,000. On this basis, the petitioner concludes that it is entitled to capital gain treatment under section 1231.[1] Petitioner further claims that the amount received should be applied to reduce its basis for the property as a whole and that any excess should be treated as a gain from the sale of a capital asset.

As the respondent points out, however, there was nothing "involuntary" in the modifications made to the theater over the preceding 20 years of its occupancy by CBS. On the contrary, it was fully contemplated by the parties that the theater would be modified for use first as a radio-broadcasting studio and subsequently as a television-broadcasting studio. On the basis of the facts, we are unable to find that there was a sale or exchange of anything. In fact, much of the property

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

removed from the theater, such as seats, curtains, carpets, and the like, would have been fully depreciated long prior to the negotiation of the new lease.

If we look to the substance of the agreement, all that CBS sought was the modification of the terms of the lease under which it would continue to occupy the property. It was for this modification that CBS was willing to pay the sum of $125,000. At no time did the parties ever contemplate that CBS would give up occupancy of the theater.

In fact, it is clear that the parties would have entered into the new lease at the agreed rental without any additional payment if CBS had not insisted upon the deletion of the restoration clause. The payment of $125,000 ultimately agreed upon for "updating" that clause is a part of the consideration paid by CBS for the terms upon which it continued to occupy the property and as such is ordinary income to the lessor. *Billy Rose's Diamond Horseshoe, Inc.* v. *United States*, 448 F. 2d 549 (C.A. 2, 1971).

In *Billy Rose's Diamond Horseshoe, Inc.*, *supra*, the taxpayer leased its theater to the National Broadcasting Co. for use as a television studio. The lessee agreed to restore the property to its original condition upon the termination of the lease. Once NBC took possession, it removed the stage, the lower lounge, many walls, two floors backstage, the existing air-conditioning equipment, and all the orchestra seats. In their place, NBC installed an appropriate structure and equipment for color television operations. Prior to the expiration of the lease, the parties entered into an agreement which established $300,000 as the value of what had been removed and as full satisfaction and compromise of the lessee's obligation to restore. NBC paid the taxpayer the sum of $300,000 by a series of notes on account of which the taxpayer sought to report the gain under the installment sales provisions of section 453. In holding against the taxpayer, the Court of Appeals for the Second Circuit pointed out that "the release not only ended the lessee's duty under the lease restoration clause but also destroyed appellant's rights to have the property restored. These contract rights came to an end and vanished. The lessee purchased no property but merely extinguished its liabilities under the restoration clause."

In the case before us, the facts point even more strongly to the conclusion that there was no sale or exchange of property. There was merely an "updating" of the restoration date, albeit the effect was to extinguish the lessee's liability for any changes or modifications prior to the new date.

Cases relied upon by the petitioner involving the taking or destruction of property for which compensatory damages were paid are not in point. In the case before us, the lessee CBS did not take or destroy anything. Over a period of years, it converted what had been a legiti-

mate theater into a television studio. There is no showing that the petitioner was not advantaged thereby. At the expiration of the respective terms of the various leases, the petitioner could have taken possession of the property and restored it at the expense of the lessee for use as a legitimate theater. We must assume that if such use would have inured to its benefit, the petitioner would have done so. On the contrary, it clearly appears that the petitioner was willing to continue to rent the theater to CBS for use as a television studio.

The case of *Hamilton & Main, Inc.*, 25 T.C. 878, similarly is inapplicable. In that case, the taxpayer purchased the property from the lessor and prior owner upon the expiration of the lessee's tenancy. As a part of the sale, the taxpayer acquired the right to damages from the lessee on account of its use of the property. Recovery of such damages was clearly a return of capital or adjustment to the purchase price. In the case now before us, the payment was made by a lessee to a lessor for the modification of the terms of a lease upon the execution of which the lessee would continue to occupy the property which was the subject of the lease.

*Decision will be entered for the respondent.*