BOSTON FISH MARKET CORPORATION, FULHAM AND MALONEY, INC., PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6054–70.    Filed March 29, 1972.

*Richard G. Maloney*, for the petitioners.
*William T. Hayes*, for the respondent.

#### OPINION

RAUM, *Judge:* The Commissioner determined deficiencies of $6,750.59 and $76,871.67 in petitioners' income tax for the calendar years 1966 and 1968, respectively. The principal issue for decision is whether $47,500 paid to petitioner in 1968 by one of its tenants in satisfaction of the tenant's obligation to restore certain leased premises to their original, prelease condition, is excludable from gross income under section 109, I.R.C. 1954, or taxable in the same manner as an amount received from the sale or exchange of a capital asset (sections 1221 and 1231, I.R.C. 1954). The facts have been stipulated.

Petitioners are Boston Fish Market Corp. and its wholly owned subsidiary, Fulham & Maloney, Inc. Both are Massachusetts corporations. At the date of the filing of the petition in this case, petitioners' principal places of business were at 253 Northern Avenue, Boston, Mass. They filed consolidated Federal corporate income tax returns for the calendar years 1966 and 1968 with the district director of internal revenue at Boston, Mass.

During the years in issue and for a number of years prior thereto, Boston Fish Market Corp. (petitioner) derived a substantial part of its income from the rental of commercial property situated on pier No. 6 in Boston, commonly known as the Boston Fish Pier. Under a series of lease agreements, the first of which was dated September 25, 1947, petitioner leased a certain portion of the Boston Fish Pier property to First National Stores, Inc. (First National or lessee). The September 25, 1947, lease agreement between petitioner and First National covered the contiguous stores numbered 4, 6, 8, and 10 of building 1 on the pier. Subsequent lease agreements between petitioner and First National dated December 22, 1953, May 1, 1958, and September 11, 1963, covered the same stores and the adjoining stores numbered

12 and 14 of building 1 in addition thereto. An amendment to the September 11, 1963, lease agreement was entered into by petitioner and First National on August 11, 1967, covering these same six premises, but converting the term of the lease to a month-to-month tenancy. In terms of store area the premises leased by First National under these agreements did not exceed 10 percent of the property on the pier which was commercially leased by petitioner.

The lease agreements and amendment entered into by petitioner and First National contained substantially identical provisions requiring the lessee, at the termination of the lease, to restore all of the stores to the condition in which they existed at the time First National originally became the lessee thereof. Such provision in the August 11, 1967, lease amendment read as follows:

"If the Lessor so elects, the premises shall be restored at Lessee's expense to their condition as six separate and individual stores. Such restoration shall follow in so far as possible the original plans of the stores in possession of the Lessor, so that each store so restored shall be separated from its adjoining store by a fire-proof partition and shall contain a concrete front stairway to the second floor and concrete back stairway both to the second and to the third floors, three toilets, and separate electrical facilities and radiators, and an individual refrigerator chest or room as originally. Lessor shall notify Lessee in writing of its election to have the premises so restored, such election to be effective if such notice is received in the office of the Lessee on said premises on or before the tenth twentieth [the typewritten word "tenth" was crossed through and the word "twentieth" written in by hand; this change was initialed only by First National's representative] day before the termination of the lease as herein extended." [The four previous agreements provided that in order to be effective the lessor's written notice of election was to be received "on or before the forty-fifth day before the termination of the lease or the date of the termination of any extended [or "renewed"] term thereof, whichever is later."]

In a letter dated February 20, 1968, First National notified petitioner of its intention to terminate its lease and vacate the six stores covered thereby. By a letter dated March 6, 1968, petitioner acknowledged such notice and also gave written notice of its own election, under the above-quoted provision of the September 11, 1963, lease and August 11, 1967, amendment thereto, that the premises be restored to their original condition by the lessee. Thereupon, petitioner and First National entered into negotiations in respect of the restoration of the leased property. As a result of these negotiations they arrived at a settlement under which First National paid $47,500 to petitioner on or about March 28, 1968, in lieu of actually restoring the premises to their original condition. And accordingly, on March 28, 1968, petitioner executed a document releasing First National from liability arising out of the lease of the six stores. At the time of the execution of the final release by petitioner and the payment of the $47,500, First National, as lessee, had no outstanding liability for rent under the

terms of the lease inasmuch as the rent had been paid in full for the period of time up to the termination date of the lease.

In the course of negotiating the final settlement of its obligations to restore the leased premises, First National had prepared at its request and for its use a report of the estimated cost of such restorations. The report showed a total estimated cost of $47,991. The required restorations consisted principally of (1) the construction of walls to divide the various stores from one another, (2) the installation of specified concrete stairways, (3) the installation of a certain number of toilets and sinks, (4) certain electrical work, and (5) the reconnection of existing radiators. Such repairs or restorations were required as a result of First National's removal, disconnection, or destruction, during the terms of the various leases or at the commencement of the initial leases, of the designated walls, stairways, plumbing fixtures, electrical wiring, and heating apparatus.

Petitioner did not maintain detailed asset ledgers. The parties have, however, stipulated to a Depreciation Schedule (as of December 31, 1967) of a portion of petitioner's depreciable assets, including the leasehold improvements made in connection with petitioner's commercial rentals on the Boston Fish Pier. The only leasehold improvements shown on this schedule as having been acquired prior to the time that First National leased all the stores in issue (December 22, 1953) had an undepreciated basis of $6,337.19 as of December 31, 1967. The record does not show that petitioner had acquired any leasehold improvements after December 22, 1953, in the stores which it had leased to First National. The foregoing pre-December 22, 1953,[1] leasehold improvements related to all of petitioner's rental assets at the Boston Fish Pier and were not specifically identified with that portion of petitioner's property that had been leased to First National.

Petitioner did not report as taxable income the $47,500, which it received in 1968 from First National in lieu of the restoration of the six stores. Instead, petitioner reduced the unrecovered basis of certain leasehold improvements, listed in the foregoing Depreciation Schedule, by book entries made as of January 1, 1968, in the total amount of $47,500, as follows:

| Date acquired | Cost | Accumulated depreciation | Unrecovered cost |
|---|---|---|---|
| 1957/1962 | $66,377 | $49,617 | $16,760 |
| 1963 | 32,166 | 9,611 | 22,555 |
| 1964 | 12,940 | 4,755 | 8,185 |
| | 111,483 | 63,983 | 47,500 |

[1] The schedule shows that the pre-Dec. 22, 1953, leasehold improvements were actually acquired during the years 1913–49.

The assets listed in these book entries as having been acquired during the period "1957/1962" also included the above-mentioned assets acquired prior to December 22, 1953, which had an undepreciated basis of $6,337.19 as of December 31, 1967.

In his deficiency notice, the Commissioner determined that petitioner "realized taxable income in the amount of $47,500.00 as a result of the payment * * * by the First National Stores, Inc., on the termination of * * * [its] lease" of the six Boston Fish Pier stores. The Commissioner accordingly increased taxable income in the amount of $47,500.

The principal issue for decision is whether the $47,500, which petitioner received in lieu of First National's restoration of the six stores to their original condition, is excludable from gross income under section 109, I.R.C. 1954, or is taxable in the same manner as an amount received from the "sale or exchange" of a capital asset. See secs. 1221 and 1231, I.R.C. 1954.[2]

Section 109 of the Code provides:

SEC. 109. IMPROVEMENTS BY LESSEE ON LESSOR'S PROPERTY.

Gross income does not include income (other than rent) derived by a lessor of real property on the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee.

The petitioner argues that the cash payment here in question qualifies as such "income * * * attributable to * * * improvements," because the "improvements" in question were in fact never made and the $47,500 was in lieu thereof. The Commissioner, on the other hand, contends that section 109 was never intended to provide for the exclusion from gross income of a cash payment in the nature of the one here in question. We agree with the Commissioner.

As its terms plainly indicate, section 109 provides only for the exclusion of income in the form of buildings and other similar improvements, constructed by a lessee, and inuring to the lessor at the termination of a lease. The present "cash" payment simply does not come within that exclusion. Indeed, throughout the history of this provision both Congress and the courts have drawn careful distinctions between income in the form of buildings and improvements and income in the form of cash, and Congress extended the exclusion only to the former.

The exclusion provision first appeared in section 22(b)(11), I.R.C. 1939, which was added to the 1939 Code by section 115(a), Revenue Act of 1942, 56 Stat. (Part 1) 812. Prior thereto and in 1940 the

---

[2] On brief the Commissioner no longer argues that the $47,500 is taxable in full as ordinary income.

Supreme Court had held in *Helvering* v. *Bruun*, 309 U.S. 461, 467–469, that a lessor realized taxable income at the termination of a lease when he acquired a "building" constructed on the leased premises by the lessee to replace a building which the lessee had previously demolished. It was in response to the *Bruun* case that Congress enacted the exclusionary provision of section 22(b)(11), which has been preserved, substantially unchanged, in section 109 of the 1954 Code. H. Rept. No. 2333, 77th Cong., 2d Sess., p. 69 (1942) ; S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 78–79 (1942). See *Max N. Tobias*, 40 T.C. 84, 94; *Oliver L. Bardes*, 37 T.C. 1134, 1147. The proponents of the measure were principally concerned with relieving the taxpayer-lessor of the possible burden of raising the funds necessary to meet the tax liability imposed by the *Bruun* case upon the receipt of essentially fixed and nonliquid assets such as "buildings * * * or other improvements" to the realty made by the lessee. 88 Cong. Rec. 6377 (1942) (remarks of Representative Disney) ; Hearings before Senate Committee on Finance on H.R. 7378, 77th Cong., 2d Sess., pp. 44–45 (1942) ; Hearings before House Ways and Means Committee on H.R. 7378, 77th Cong., 2d Sess., p. 2247 (1942).

The House and Senate reports similarly explained the purpose of the exclusion in identical language (H. Rept. No. 2333, 77th Cong., 2d Sess., p. 69; S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 78–79) :

In *Helvering* v. *Bruun*, (309 U.S. 461 (1940) ), it was held that *buildings or other improvements made by a lessee constitute income to a lessor to the extent of the value of such improvements* at the time the lease is forfeited and the lessor secures control and possession of the property. Your committee believes it advisable to *exclude* (except in cases in which such improvements represent a liquidation in kind of lease rentals) *from the gross income of the lessor income attributable to such improvements.* Such exclusion from gross income of the lessor does not mean that the *enhancement* in value in the hands of the lessor will not be ultimately taxed. By reason of the fact that the gross income attributable to the value of the improvements is not recognized, the basis of the property in the hands of the lessor will not be increased by such item. [Emphasis supplied.]

It was, therefore, solely that type of income—"buildings and other improvements"—with which the *Bruun* case dealt and for which Congress provided the exclusion.[3] Such improvements inhere in and "enhance" the value of the lessor's property, and it was felt that the tax recognition date should be postponed until the property was sold and the lessor was in a better position to meet his tax liabilities.

A cash payment, in *liquidation* of a lessee's obligation to make restorations to leased premises, suggests none of the difficulties posed by

---

[3] The use of such words as "attributable to such improvements" (in the statute, regulations, committee reports, etc.) was obviously intended merely to *identify that income that was realized by reason of the lessor's reacquisition of his property with improvements made by the lessee. It was plainly not intended to refer to the receipt of money.*

the *Bruun* case and sought to be remedied by the exclusionary provisions of section 22(b)(11) of the 1939 Code and section 109 of the 1954 Code. The income thus received is neither so intrinsically part of the property in respect of which the payment is made as to create problems in ascertaining its value, nor is it so "fixed" an asset as to possibly place a burden on the lessor in raising the necessary funds to discharge a tax liability imposed upon receipt. Indeed, in both instances the opposite is true. Accordingly, both before and after the *Bruun* case and the responsive legislation thereto in the Revenue Act of 1942, similar "cash" payments have generally been regarded as having been received in sale or exchange of the unrestored property. Cf. *Washington Fireproof Building Co.*, 31 B.T.A. 824, 827–828 (Murdock, *J.*, concurring); *Guy L. Waggoner*, 15 T.C. 496, 502–503 (quoting and approving Judge Murdock's concurring opinion in *Washington Fireproof Building Co.*, 31 B.T.A. at 827–828); *Hamilton & Main, Inc.*, 25 T.C. 878, 882. Any recovery of cash in excess of the basis of such property would therefore constitute taxable income to the lessor. See *Hamilton & Main, Inc.*, 25 T.C. at 882. Cf. *Washington Fireproof Building Co.*, 31 B.T.A. at 827–828 (Murdock, *J.*, concurring). We, therefore, think that the $47,500 received by petitioner in 1968 is taxable to the extent that it exceeds the undepreciated basis of the leasehold improvements destroyed, removed, or disconnected by the lessee.

In this latter respect, the record before us is clear that the basis of this property was no more than $633.72. During the course of the lease First National removed certain fixtures from each of the six stores which were present *prior* to the commencement of the initial leaseholds. Such leaseholds commenced on September 25, 1947, in respect of stores numbered 4, 6, 8, and 10 of building 1, and on December 22, 1953, with respect to the two additional stores numbered 12 and 14 of building 1. Petitioner's Depreciation Schedule disclosed only $6,337.19 in undepreciated leasehold improvement assets acquired prior to the 1953 date, and such improvements were made in the period 1913 to 1949. Moreover, these leasehold improvements pertained to all of petitioner's commercially leased property on the Boston Fish Pier, whereas the six stores here in question accounted for only 10 percent of the leased area. Therefore, we think a reasonable allocation as to the basis of the unrestored property can be made along these lines by allotting 10 percent of the undepreciated basis of all the petitioner's leasehold improvement assets acquired prior to 1953 to the six stores leased by First National. This is not a case like *Hamilton & Main, Inc.*, 25 T.C. at 883—contrary to petitioner's suggestion—where apportionment of the basis of the leasehold improvements is "wholly impracticable or impossible." We, therefore, find no merit in petitioner's argument that the entire $47,500,

received in lieu of the restoration of the six stores, should be treated as a return on capital, with a consequent reduction in the basis of property acquired by petitioner after 1953 which was wholly unrelated to the leasehold improvements here in issue.[4]

*Decision will be entered under Rule 50.*

---

[4] We similarly regard without merit petitioner's alternative contention that the basis of the unrestored property was at least 50 percent of the $47,500 received by it in 1968.