SIRBO HOLDINGS, INC., Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 167, Docket 72-1617.

United States Court of Appeals,
Second Circuit.

Argued Nov. 6, 1972.

Decided March 23, 1973.

James R. McGowan, Providence, R. I. (Lester H. Salter, Salter, McGowan, Arcaro & Swartz, Providence, R. I., of counsel), for petitioner-appellant.

Mary J. McGinn, Atty., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Ernest J. Brown, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel), for respondent-appellee.

Before FRIENDLY, Chief Judge, MANSFIELD and TIMBERS, Circuit Judges.

FRIENDLY, Chief Judge:

The issue is whether a tenant's payment to its landlord of $125,000 in satisfaction of the tenant's obligation to restore leased premises to their pre-lease condition is entitled, in whole or in part, to long-term capital gains treatment under § 1231 of the Internal Revenue Code

of 1954.[1] The Commissioner determined the payment, which was received by petitioner, Sirbo Holdings, Inc. ("Sirbo") from its tenant, to be taxable as ordinary income, and accordingly found a deficiency in petitioner's income tax for the taxable year ending June 30, 1964, which was upheld by the Tax Court. Petitioner then sought review pursuant to 26 U.S.C. § 7482.

The essential facts are undisputed: At all relevant times Sirbo was engaged in the trade or business of renting real estate. In 1944 it purchased premises at 254–6 West 54th Street, New York, N. Y., which consisted of a building with offices and a theatre called The New Yorker Theatre, subject to an existing lease of the theatre to the Columbia Broadcasting System, Inc. ("CBS"), which used it for radio broadcasting purposes. In July, 1944, Sirbo notified CBS that it had purchased the entire building and would assume all the terms and obligations of the theatre lease. In anticipation of the expiration of the existing lease term in 1948, Sirbo in November, 1947, negotiated a new lease of the theatre to CBS. Thereafter Sirbo continuously rented the theatre to CBS under several successive leases until at least December 31, 1968. Each lease gave CBS the "right to use the premises as a theatre, and for radio broadcasting and television purposes of its business." Until 1964 each lease provided that at the expiration of the lease term CBS "shall restore the premises substantially to the condition in which they existed on November 14, 1947, reasonable wear and tear and damage by the elements excepted, and . . . shall fully indemnify [Sirbo] for every and all costs and expenses of whatsoever name or nature that may be required for the purposes of reinstating the premises to said condition." [2]

1. For the taxable year involved in this appeal, 26 I.R.C. § 1231 provided in relevant part:

   § 1231. *Property used in the trade or business and involuntary conversions*

   (a) General rule.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. . . .

       \*    \*    \*    \*    \*

   (b) Definition of property used in the trade or business.—For purposes of this section—

       (1) General rule.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

       (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

       (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or

       (C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in paragraph (3) of section 1221. . . .

2. The full leasehold obligation contained in the indenture covering the period July 1, 1958 through December 31, 1963, which is the subject of the payment in issue in this case, provides:

   Fourth:—At the expiration or other termination of the term hereby granted, the Tenant shall and will leave the said premises and the theatre whole and in good order and condition and will remove therefrom every and all its equipment, goods, and effects, and those of all persons claiming under it, and will deliver up the demised premises in good order and condition, reasonable wear and tear and damage by the elements excepted, it being understood that all scenery therein, stage hangings, properties, decora-

Prior to December 31, 1963, according to findings of the Tax Court,[3] CBS, becoming concerned over rising construction costs which made it difficult to predict its ultimate cost of fulfilling its obligations to restore premises leased by it, determined as a matter of corporate policy to eliminate or update restoration clauses from leases it held for theatres in New York and so advised Sirbo. The parties negotiated the terms of the 1964 lease, including an "updated" restoration clause which limited CBS' terminal obligation to restore the theatre to removal of alterations or additions made after January 1, 1964, and repair of any damage caused thereby. Thereupon they entered into separate negotiations for settlement of CBS' obligation under the former lease to restore the theatre to its 1947 condition. Each party caused appraisals of the cost of restoration to be made. Estimates of $70,000 and $200,000 were made by representatives of CBS and Sirbo, respectively, and the sum of $125,000 was agreed upon as a compromise figure. The sizable cost estimates reflected the changes CBS had made after 1947 to adapt the former legitimate theatre for use as a television studio. As found by the Tax Court, these "changes included the removal of approximately 300 to 400 theatre seats, . . . all carpeting, chandeliers, and stage curtains; the extension of the stage area . . ., a change in the floor level and the elimination of the 'loop' in the former seating arrangement, the construction of walls and partitions and appropriate structural changes to accommodate control rooms, the alteration of bathrooms and the heating system, and the installation of thousands of feet of electrical wiring." The restoration clauses contained in the leases covering the period from 1953–1964 implicitly recognized the alterations made by CBS by providing for the eventual replacement of the removed seats, the removal of the control booths, and the removal of the extension of the stage apron.[4]

In a settlement signed on January 31, 1964 but backdated to December 31, 1963, CBS paid Sirbo the $125,000 sum for the release of any claims, injury or damage Sirbo might have as a result of the provisions of the restoration clause contained in the lease dated July 15, 1958. The release stated that Sirbo had claimed at the expiration of the lease term that CBS had partially destroyed the premises and Sirbo therefore requested indemnification for the cost of reinstating the premises to their condition in 1947; CBS acknowledged its obligation so to indemnify Sirbo.[5] No por-

tions and equipment, including but not limited to radio and/or audio equipment, and its associated equipment, installed and paid for by the Tenant, which may be affixed to or contained in the herein demised premises may be removed by the Tenant whether the same constitutes fixtures or not, provided, however, that the Tenant shall restore the premises substantially to the condition in which they existed on November 14, 1947, reasonable wear and tear and damage by the elements excepted, and the Tenant shall fully indemnify the Landlord for every and all costs and expenses of whatsoever name or nature that may be required for the purposes of reinstating the premises to said condition. Tenant agrees to restore any and all seats heretofore removed by Tenants, to remove the control booths installed by Tenant and to remove the extension of the stage apron installed by Tenant.

The prior instruments contained essentially the same provision.

3. The Tax Court's findings of fact are published in Sirbo Holdings, Inc., 57 T.C. 530 (January 27, 1972).

4. See note 2 *supra*.

5. In addition, for nominal consideration, the parties mutually executed general releases from any liability arising out of the 1958 lease. In the release dated December 23, 1963, CBS also discharged Sirbo from any liability arising from the use and occupancy of its premises by CBS, and in the release dated January 31, 1964, Sirbro discharged CBS from any liability arising out of the "use, occupancy, alteration, addition, removal, or im-

tion of the payment was used to restore the structure to its former use as a legitimate theatre, however, since CBS continued in occupancy. Indeed, the Tax Court found that, after entering into the 1964 lease, CBS made further modifications in the theatre to adapt it for use as a color television studio.

On its corporate tax return for its taxable year ending June 30, 1964, Sirbo reported as long-term capital gain resulting from "involuntary conversion as a result of partial destruction of property used in trade or business," the amount by which the $125,000 received from CBS exceeded Sirbo's adjusted basis in the entire property, $93,333.51 (including the leased theatre as a part), i. e., $31,666.49.[6] The Commissioner determined that the $125,000 payment from CBS was taxable as ordinary income rather than as long-term capital gain and accordingly noted a deficiency in Sirbo's tax liability for the taxable year in question. Sirbo's ordinary income was increased by that amount and capital gain was decreased by $31,666.-49, resulting in a net deficiency in income tax of $53,573.30. Sirbo was allowed additional depreciation for the year in issue in the amount of $4,444.44, however, which had not been taken because the taxpayer had claimed an involuntary conversion of the property.

The government does not dispute that the property to which the release of the obligation to restore related was "property used in [Sirbo's] trade or business" within the meaning of § 1231. It denies, however, that the $125,000 payment constituted either gain on its compulsory or involuntary conversion, or from its sale or exchange. Insofar as

petitioner rested its claim to capital gains treatment on the involuntary conversion clause of § 1231, we agree with the Tax Court that it failed. The New Yorker Theatre was voluntarily leased to CBS with the understanding that it might be converted for use as a television studio. When CBS sought to be released from its obligations to restore the theatre to its 1947 condition and to indemnify Sirbo for the cost of doing so, Sirbo voluntarily agreed to accept a cash payment rather than enforce these obligations. This was understandable from Sirbo's vantage point, since CBS wanted to continue to occupy the converted theatre and use it as a television studio at a substantial rental. But the decision to accept the $125,000 rather than hold CBS to its obligation to restore was not "compulsory or involuntary." It is not claimed that it resulted from duress or some external force over which Sirbo had no control, such as occurs when property is destroyed by natural causes, is stolen or seized, or is transferred under power or threat of eminent domain.

The cases relied upon by petitioner on this point are distinguishable. In Guy L. Waggoner, 15 T.C. 496 (1950), the taxpayers leased property to the United States under threat of condemnation. The lease gave the government a qualified right to alter the premises, but provided for restoration at the taxpayers' request. When the taxpayers subsequently requested restoration, the United States decided to pay the cost of repair for damage it had caused while in possession rather than itself restore the premises. Thus, as the Tax Court held, the property altered or destroyed was involuntarily converted into money within

---

provement" of the premises by CBS. Both general releases were to be held in escrow pending execution of the new lease which was to be simultaneous with the first installment of the payment by CBS for the "purchase" of the theatre equipment. A separate letter casting the $125,-000 payment by CBS in the form of the purchase price of personal property and theatre equipment owned by Sirbo, but

not yet inventoried, was apparently never signed.

6. The Tax Court found that Sirbo had never apportioned the basis of the building between the theatre and the offices which make up the remainder, but that the adjusted basis for the whole building (cost basis of $266,666.67 less accumulated depreciation to 1964 of $173,-333.16) was $93,333.51.

the meaning of the predecessor to § 1231, and the taxpayers' acceptance of compensation for the property in lieu of actual restoration "did not alter the character of the lease agreement." 15 T.C. at 503. See also C. I. R. v. Gillette Motor Transport, Inc., 364 U.S. 130, 135–136, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960). Sirbo, however, was neither forced to lease the premises to CBS nor compelled to accept the payment instead of requiring renovation. The settlement it reached with its tenant did not arise from an occupancy imposed upon it pursuant to law, but from an occupancy it sought as part of its normal business operations. Unlike the taxpayers in *Guy L. Waggoner, supra,* it could choose whether it would lease its premises, the identity of the person to whom it might lease them, and the conditions of occupancy.

Similarly, in Walter A. Henshaw, 23 T.C. 176 (1954), and United States v. Pate, 254 F.2d 480 (10 Cir. 1958), the property of the taxpayer used in the trade or business (oil in place in *Henshaw,* a building in *Pate*) was physically damaged under circumstances beyond the taxpayer's control, namely through the negligence of others. In both cases the taxpayer recovered monetary damages as a result of litigation, and the sums were taxed as long-term capital gains from the compulsory or involuntary conversion of the damaged property. Here the structural modifications needed to convert the theatre to a television studio were contemplated as a distinct possibility under the lease agreement and were essentially made with Sirbo's consent, subject to the obligation to restore.

Relying on Grant Oil Tool Co. v. United States, 180 Ct.Cl. 620, 381 F.2d 389 (1967), Sirbo urges that prior contemplation of alterations in the leased structure does not deprive the lessee's conversion of its involuntary character, even when the lease agreement provides for restoration or compensation to the lessor. We disagree. *Grant Oil Tool Co.* differs in a crucial respect. There the

taxpayer could not have had restoration of the destroyed property, whereas Sirbo could. In that case a manufacturer leased oil well drilling tools to drillers for use in their business, subject to loss in the drill hole, misplacement, or damage beyond repair due to the driller's negligence in use. The decision to abandon or try to retrieve the tools lost in the drill hole was found to be exclusively that of the driller-lessee, who was obligated in either event to reimburse the lessor at the sale price of new equipment. These payments were held to be entitled to capital gains treatment pursuant to § 1231(a) as a "compulsory or involuntary conversion," for the reason that the "complete and unwanted destruction of [the] taxpayer's tool bodies" which brought it "within the definition of 'involuntary conversion' as set forth in § 1231(a)," *id.* at 395–396, was beyond the taxpayer's control once its property was leased. As far as the lessor was concerned the property destroyed in the lessee's operations was irretrievably lost without opportunity of restoration or recovery. See also Philadelphia Quartz Co. v. United States, 179 Ct.Cl. 191, 374 F.2d 512 (1967). In contrast, not only did Sirbo have the power to fashion the lease agreement to prevent CBS from making the extensive alterations which were the subject of the payment, but it had the right to pursue the possible avenue of requiring CBS to restore the property to its former condition and voluntarily chose not to do so.

■ ■ While involuntary conversion was the ground most strongly argued by Sirbo, it contended in the alternative that the transaction constituted the sale or exchange of property used in the trade or business. Judge Quealy rejected that contention, largely on the basis of extensive dicta in this court's decision in Billy Rose's Diamond Horseshoe, Inc. v. United States, 448 F.2d 549, 551–552 (2 Cir.), aff'g 322 F.Supp. 76 (S.D.N.Y.1971). In there holding that a landlord receiving a series of notes in satisfaction of an obligation to restore was not entitled to the benefits of the in-

stallment sales provision of I.R.C. § 453(a), the court noted that the landlord's relinquishment of its rights to have the property restored caused these rights to have come "to an end and vanished" and thus could not constitute a "sale or other disposition of real property" under § 453(b)(1)(A). At least as applied to the question of capital gains treatment under § 1231, this seems to be taking somewhat of a keyhole view. Sirbo's claim for capital gains treatment does not rest entirely on the release of the covenant to restore, which clearly was not "property used in the trade or business," but it is based at least in part on CBS' payment for removal or destruction of "property" such as the theatre seats, carpeting, chandeliers, stage curtains and various structural features of the theatre. Realistically CBS was paying Sirbo for what it had done to this property over the years. Under our decision in C. I. R. v. Ferrer, 304 F.2d 125, 131 (2 Cir. 1962), see Eustice, Contract Rights, Capital Gain and Assessment of Income—the Ferrer Case, 20 Tax L.Rev. 1, 7–34 (1964), it would not be fatal that this property did not "pass" to CBS. If the lease, in lieu of an obligation to restore, had obligated CBS from the outset to pay for the property to be removed or damaged by it, there could be little question but that the payment would be viewed as a sale or exchange of property used in the trade or business, see Hamilton & Main Inc., 25 T.C. 878 (1956); Washington Fireproof Building Co., 31 B.T.A. 824 (1934), since the government does not contend that such a payment would represent "collapsed income." See, e. g., Hort v. C. I. R., 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941); Holt v. C. I. R., 303 F.2d 687 (9 Cir. 1962); W. Lawrence Oliver, 24 T.C.M. 438 (1965). From a practical standpoint it is hard to see why the transaction here at issue should be treated differently. Classification of CBS's payment as ordinary income merely because of the parties' failure to cast the transaction at least partly in the form of a sale of the removed or damaged property would appear to exalt form over substance.

What makes a hard case even harder is the following: Two months after the decision here, Judge Raum of the Tax Court accorded capital gains treatment to a payment almost identical in nature. Boston Fish Market Corp., 57 T.C. 884 (March 29, 1972). Sirbo immediately moved for reconsideration, but its motion was denied without a word of explanation. The government does not assert any pertinent distinction between the facts of the two cases; rather, it seeks to explain the disparate results on the ground that the taxpayer's contention in *Boston Fish Market* was that the lessee's payment was not income at all in light of the provision of I.R.C. § 109 excluding from gross income the value of a lessee's improvements to which the lessor falls heir on the termination of a lease and, once that point was decided against the taxpayer, the Commissioner abandoned his challenge to the propriety of capital gains treatment, see 57 T.C. at 887 n. 2. The attempted explanation does not explain, for two reasons.

The first is that the Commissioner has a duty of consistency toward similarly situated taxpayers; he cannot properly concede capital gains treatment in one case and, without adequate explanation, dispute it in another having seemingly identical facts which is pending at the same time. *Compare* Moog Industries, Inc. v. FTC, 355 U.S. 411, 414, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958), with FTC v. Universal-Rundle Corp., 387 U.S. 244, 250–252, 87 S.Ct. 1622, 18 L. Ed.2d 749 (1967); K. C. Davis, Discretionary Justice: A Preliminary Inquiry, ch. VII (1969); L. Jaffe, Judicial Control of Administrative Action 700 (1965). That the Commissioner's seeming inconsistency may have arisen from the right hand's ignorance of the posture of the left is little solace to taxpayers who are entitled to a non-discriminatory administration of the tax laws by him, much less to a taxpayer like Sirbo

who is disadvantaged by the discrimination in its case.[7]

The second reason is that Judge Raum did not rest on the Commissioner's concession. He said squarely that payments like that in *Boston Fish Market* and here "have generally been regarded as having been received in sale or exchange of the unrestored property," 57 T.C. at 889, citing several cases including the highly pertinent one of Hamilton & Main, Inc., *supra*, 25 T.C. at 882, and Judge Murdock's concurring opinion in Washington Fireproof Building Co., *supra*, 31 B.T.A. at 827–28.

The Tax Court's failure to reconcile its decision here with that in *Boston Fish Market, cf.* IRC § 7460(b), may have rested, although this is only speculation, upon a belief that, under its ruling in Jack E. Golsen, 54 T.C. 742, 756–58 (1970), it was bound in this case by the dicta in *Billy Rose, supra*, 448 F.2d 549. We say dicta because, as indicated, the issue in that case was not whether the transaction came within I.R.C. § 1231 but whether a series of payments like the single payment here in question constituted income from "a sale or other disposition of real property" or "a casual sale or other casual disposition of personal property" so as to qualify for treatment as an installment sale under I.R.C. § 453(b). In view of the background of the installment sale provisions, which are to be strictly construed, see 2 Mertens, Law of Federal Income Taxation, § 15.01 (1967); see, *e. g.*, Harry Leland Barnsley, 31 T.C. 1260, 1263 (1959), one could conclude that the transaction in *Billy Rose* was not a "sale or other disposition of real property" for purposes of § 453(b) without deciding whether the income it generated should be treated as capital gains or ordinary income under § 1231—an issue which the taxpayer in that case did not raise. The case law offers examples of transactions allowed installment treatment under § 453(b)(1)(A) which were treated successively as capital gains and as ordinary income when the tax law changed before an installment obligation matured. See Murray v. United States, 192 Ct.Cl. 63, 426 F.2d 376, 381 (1970) ("The function of section 453 is one of timing, not characterization. [U]se of the installment method defers the reporting of taxable gain, but in no way characterizes the nature of the gain.") See also Snell v. C.I.R., 97 F.2d 891 (5 Cir. 1938); Zola Klein, 42 T.C. 1000 (1964); 2 Mertens, *supra*, § 15.11. Furthermore, the committee reports on § 212(d) of the Revenue Act of 1926, 44 Stat. 23, which purported to "define the situations and business to which such [installment] basis might be applied," [8] neither made explicit reference to characterization as capital gains nor referred solely to classes of transactions which today would demand capital gains treatment. H.R.Rep. No. 1, 69th Cong., 1st Sess. (1926), reprinted in Cum.Bull. 1939–1 part 2, at 346–47. In view of the different purposes of the two provisions, Congress might well be thought to have intended a more restrictive meaning for "sale or other disposition" in § 453(b) than for "sale or exchange" in § 1231(a).

---

7. This is not a situation where the Commissioner is obliged to take inconsistent positions in order to prevent the government from being whipsawed. See United States Steel Corp. v. United States, 445 F.2d 520, 525 n. 7 (2 Cir. 1971), cert. denied, 405 U.S. 917, 92 S.Ct. 940, 30 L.Ed. 2d 786 (1972).

8. Earlier Revenue Acts had provided for installment sales treatment only by implication. Regulations promulgated by the Commissioner, dating from 1919, providing for such treatment were ruled invalid or severly limited by earlier Board of Tax Appeals decisions. See Manomet Cranberry Co., 1 B.T.A. 706, 708 (1925); B.B. Todd, Inc., 1 B.T.A. 762, 767 (1925). The 1926 Act section was designed to "validate" these regulations. The 1926 provision has remained basically intact, undergoing only "the usual development in the case of new statutory provisions dealing with complicated problems." 2 Mertens, *supra*, § 15.02, at 7.

We freely concede that the *Billy Rose* court apparently considered the issues under §§ 453(b) and 1231 to be identical and that Judge Quealy cannot be faulted for believing that the *Billy Rose* panel would have rejected Sirbo's claim. But the Tax Court fulfills its duties under *Jack E. Golsen, supra,* if it respects *decisions* of a court of appeals to which appeals will be taken and should be free to voice its disagreement with statements not essential thereto; indeed, *Golsen* speaks of a duty to follow a "Court of Appeals decision which is squarely in point." 54 T.C. at 757. This is particularly true when, despite attempted distinction, *Billy Rose, supra,* 448 F.2d at 552 & n. 1, the statements here relied upon by Judge Quealy are to some extent inconsistent with the main thrust of this court's earlier decision in *Ferrer,* which has been followed elsewhere. See, *e. g.,* United States v. Dresser Industries, Inc., 324 F.2d 56, 59 (5 Cir. 1963).

The basic inconsistency in approach between *Ferrer* and *Billy Rose* has already attracted comment, see 14 B.C. Ind. & Comm.L.Rev. 183 (1972). It may be that en banc proceedings will be needed to resolve this. However, even though the question is one of law, this court, before going down that path, should have the benefit of the considered views of the Tax Court, hopefully the full court, I.R.C. § 7460(b), on whether it would follow *Boston Fish Market*[9] on the facts here if it deemed itself free to do so, as we think it is.[10]

The judgment of the Tax Court is vacated and the cause remanded for further proceedings consistent with this opinion. Costs shall abide the event.

---

9. We agree with the Commissioner that taxpayer's attempt to use its basis for the entire building to determine the amount of gain was unwarranted. But there would be no more difficulty in allocating taxpayer's basis in this case than in *Boston Fish Market,* see 57 T.C. at 889–90.

---

10. The Tax Court should require the Commissioner to explain and justify the different positions taken by him in this case and in *Boston Fish Market.*